## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: GARY S. KATZMANN, JUDGE**

IPG PHOTONICS CORPORATION,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,

*Defendant-Intervenor*.

Court No. 25-00212

**NONCONFIDENTIAL**

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

William F. Marshall
Sarah S. Sprinkle
Gregory G. Toth
Christopher D. Yankson
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0138

Dated: March 3, 2026

wmarshall@strtrade.com

## TABLE OF CONTENTS

RULE 56.2 STATEMENT ................................................................................................... 2

BACKGROUND ............................................................................................................... 3

   I.   The U.S. International Trade Commission Determines that Chinese Finished Heat Sinks, Precision-Made Parts for Electronic Products Rather than Ordinary Aluminum Extrusions, Pose No Material Threat to the Domestic Industry ........................................................... 3

   II.   Commerce's Antidumping and Countervailing Duty Orders on Chinese Aluminum Extrusions Exclude Finished Heat Sinks From Their Scope .............................................. 5

   III.   This Court Twice Rejects Commerce's Attempts to Narrow the Finished-Heat-Sink Exclusion ............................................................................................................................. 6

   IV.   Commerce Nevertheless Determines that the Finished-Heat-Sink Exclusion Does Not Cover IPG's Laser Heat Sinks ....................................................................................... 8

STANDARD OF REVIEW .......................................................................................... 12

SUMMARY OF ARGUMENT ..................................................................................... 13

ARGUMENT .................................................................................................................. 14

   I.   The Orders' Finished-Heat-Sink Exclusion Covers IPG's Heat Sinks ............................. 14

      A. Each IPG Heat Sink was Designed to Meet, and Fully Tested for Compliance With, its Corresponding Laser's Thermal Performance Requirements ........................................... 14

      B. The (k)(1) Sources Confirm that IPG's Heat Sinks are Covered by the Exclusion's Plain Language ...................................................................................................................... 16

      C. The (k)(2) Factors Likewise Confirm that IPG's Heat Sinks are Finished Heat Sinks Covered by the Exclusion ........................................................................................... 17

   II.   Commerce's Determination that IPG's Heat Sinks Fall Within the Orders' Scope is Unsupported by Substantial Evidence and is Otherwise Contrary to Law ...................... 18

      A. Commerce Unreasonably Discounted Evidence Detailing the Lengths to Which Heat Sinks for IPG's Lasers Must be Customized ................................................................... 19

      B. Commerce Unreasonably Ignored IPG's Evidence of Downstream Thermal Performance Testing, Imposing a "Tangibility" Requirement not Found in the Exclusion .................. 23

CONCLUSION ............................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agilent Techs. v. United States,*
  256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) ........................................................................ 6, 24

*Agilent Techs. v. United States,*
  335 F. Supp. 3d 1347 (Ct. Int'l Trade 2018) ............................................................... *passim*

*Agilent Techs. v. United States,*
  Court No. 16-00183, Joint Stipulation for Entry of Judgment, ECF No. 72 (Ct. Int'l Trade July 24, 2019) .......................................................................................................................................... 7

*Assan Aluminyum Sanayi ve Ticaret A. S. v. United States,*
  789 F. Supp. 3d 1257 (Ct. Int'l Trade 2025) ............................................................................ 22

*Daewoo Elecs. Co. v. United States,*
  6 F.3d 1511 (Fed. Cir. 1993) ...................................................................................................... 16

*Diversified Prods. Corp. v. United States,*
  572 F. Supp. 883 (Ct. Int'l Trade 1983) .................................................................................... 13

*Meridian Prods., LLC v. United States,*
  851 F.3d 1375 (Fed. Cir. 2017) .................................................................................................. 12

*Michalic v. Cleveland Tankers, Inc.,*
  364 U.S. 325 (1960) ..................................................................................................................... 16

*NSK, Ltd. v. United States,*
  390 F.3d 1352 (Fed. Cir. 2004) .................................................................................................. 24

*SEC v. Chenery Corp.,*
  318 U.S. 80  (1943) ...................................................................................................................... 22

*Suzano S.A. v. United States,*
  589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ...................................................................... 20, 22

*Wagner Spray Tech Corp. v. United States,*
  779 F. Supp. 3d 1311 (Ct. Int'l Trade 2025) ............................................................... *passim*

*Wagner Spray Tech Corp. v. United States,*
  Court No. 23-00241, Joint Status Report, ECF No. 50 (Ct. Int'l Trade Jan. 8, 2026) ............... 8

*Wheatland Tube Co. v. United States,*
  161 F.3d 1365 (Fed. Cir. 1998) .................................................................................................. 12

*Whirlpool Corp. v. United States*,
  890 F.3d 1302  (Fed. Cir. 2018) ............................................................................. 12

**Statutes**

19 U.S.C § 1516a(b)(1)(B)(i) .................................................................................. 12

19 U.S.C. § 1516a(a)(2)(A)(ii) ............................................................................... 11

19 U.S.C. § 1516a(a)(2)(B)(vi) ............................................................................... 12

28 U.S.C. § 2636(c) ............................................................................................... 11

**Rules**

USCIT Rule 3(a)(2) ............................................................................................... 11

**Regulations**

19 C.F.R. § 351.225 .............................................................................................. 12

19 C.F.R § 351.225(k)(1)(ii) .................................................................................. 12

19 C.F.R. § 351.225(k)(1)(i) .............................................................................. 12, 16

19 C.F.R. § 351.225(k)(2)(i) .............................................................................. 13, 17

19 C.F.R. § 351.225(k)(2)(ii) ................................................................................. 13

**Administrative Decisions**

*Aluminum Extrusions Fair Trade Comm.*
  1371 36 C.I.T. ............................................................................................ 4, 5, 17

*Aluminum Extrusions Fair Trade Comm. v. United States*,
  968 F. Supp. 2d 1244 (Ct. Int'l Trade 2014) ............................................................ 5

*Aluminum Extrusions from the People's Republic of China*,
  76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) ................................ *passim*

*Aluminum Extrusions from the People's Republic of China*,
  76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) ................................ *passim*

*Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on IPG Photonics
  Corporation's Heat Sinks* (Dep't of Commerce Aug. 27, 2025) ........................ *passim*

*Certain Aluminum Extrusions from China,*
    75 Fed. Reg. 17,436 (ITC Apr. 6, 2010) ............................................................... 3

*Certain Aluminum Extrusions from China,*
    76 Fed. Reg. 29,007 (ITC May 19, 2011) .............................................................. 3

*Certain Aluminum Extrusions from China,*
    76 Fed. Reg. 29,007 (ITC May 19, 2011) .............................................................. 5

*Certain Aluminum Extrusions from China*,
    Investigation Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 1 (May 2011) .................. *passim*

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| IPG PHOTONICS CORPORATION, | |
| *Plaintiff*, | |
| | |
| v. | Court No. 25-00212 |
| | |
| UNITED STATES, | **NONCONFIDENTIAL** |
| | |
| *Defendant*, | |
| | |
| and | |
| | |
| ALUMINUM EXTRUSIONS FAIR TRADE | |
| COMMITTEE, | |
| *Defendant-Intervenor*. | |

## <u>PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Plaintiff IPG Photonics Corporation designs and manufactures fiber lasers for a variety of technical uses, including materials processing, medical applications, and scientific research.

IPG's lasers naturally require tailor-made parts. Many of those parts, like heat sinks, are essential to the lasers' operation. Heat sinks are aluminum devices that absorb and dissipate the heat that electronic products generate. Without customized heat sinks, IPG's lasers would overheat and self-destruct.

About 15 years ago, the U.S. International Trade Commission determined that "finished" heat sinks from China had not injured, and posed no material threat of injury to, the domestic industry. Accordingly, the U.S. Department of Commerce's antidumping and countervailing duty orders on aluminum extrusions (the Orders) exclude finished heat sinks from their scope. But Commerce has resisted giving the plain language of the finished-heat-sink exclusion its full effect. Twice, Commerce has attempted to narrow the exclusion, and twice, this Court has rejected those

attempts. *Agilent Techs. v. United States*, 335 F. Supp. 3d 1347 (Ct. Int'l Trade 2018); *Wagner Spray Tech Corp. v. United States*, 779 F. Supp. 3d 1311 (Ct. Int'l Trade 2025).

This proceeding is the result of Commerce's latest attempt. Commerce reasoned in its scope ruling that IPG's heat sinks were not "finished" within the meaning of the Orders. Specifically, despite evidence demonstrating that the heat sinks were specially designed and tested to perform in IPG's lasers within specific temperature parameters, Commerce concluded that the heat sinks were neither designed to meet specified thermal performance requirements nor fully tested to meet them. But in so concluding, Commerce misinterpreted the Orders' plain language and unconvincingly disregarded IPG's evidence.

The Court should grant IPG's motion for judgment on the agency record and remand this matter to Commerce for reconsideration.

## RULE 56.2 STATEMENT

1.     IPG seeks review of Commerce's scope ruling determining that the Orders' finished-heat-sink exclusion does not cover IPG's heat sinks. Mem. from J. Kalitka to S. Fullerton, re: *Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on IPG Photonics Corporation's Heat Sinks* (Dep't of Commerce Aug. 27, 2025) (the Final Scope Ruling); *see Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) (Antidumping Duty Order); *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) (Countervailing Duty Order).

2.     The issue presented is whether Commerce properly determined that IPG's heat sinks fell outside the Orders' finished-heat-sink exclusion. IPG challenges this determination as unreasonable, unsupported by substantial evidence, and otherwise contrary to law.

2

3.     IPG requests an order holding that Commerce's determination was not supported by substantial evidence on the record, and was otherwise not in accordance with law, and remanding this matter to Commerce for reconsideration in accordance with the Court's decision.

## BACKGROUND

## I.     The U.S. International Trade Commission Determines that Chinese Finished Heat Sinks, Precision-Made Parts for Electronic Products Rather than Ordinary Aluminum Extrusions, Pose No Material Threat to the Domestic Industry

In 2010, the U.S. International Trade Commission launched an investigation into whether imported aluminum extrusions from China were materially injuring (or threatening to materially injure) a domestic industry. *Certain Aluminum Extrusions from China,* 75 Fed. Reg. 17,436 (ITC Apr. 6, 2010). The Commission ultimately determined that although some aluminum extrusion imports were harming the domestic industry, "finished heat sinks" were not. *Certain Aluminum Extrusions from China,* 76 Fed. Reg. 29,007 (ITC May 19, 2011).

That determination was grounded in the fact that finished heat sinks are not ordinary aluminum extrusions but instead specialized parts for electronic products. Specifically, as the Commission explained, finished heat sinks "are not different from other aluminum extrusions in terms of their metallurgic chemistry, or by virtue of being further fabricated or produced in custom shapes." *Certain Aluminum Extrusions from China*, Investigation Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 at 1 (May 2011) (ITC Final Report). Rather, finished heat sinks "are different from most other aluminum extrusions" in two main respects. *Id.*

First, finished heat sinks are different from ordinary aluminum extrusions "by virtue of the specific and precise tolerances to which they are generally produced." *Id.* These specialized parts "are designed to remove damaging heat from electronic equipment. The flat surface tolerance for" finished heat sinks "is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch

per inch for ordinary aluminum extrusions." *Id.* "The precise flatness of" finished heat sinks "allows for close contact" with "the heat-generating components for which" the heat sinks "have been designed and to which they are attached, thereby reducing or eliminating heat-trapping 'dead air.'" *Id.*

Second, finished heat sinks "also differ from other aluminum extrusions (including heat sinks that are not 'finished') because of their customized thermal resistance properties." *Id.* "Whereas most aluminum extrusions are differentiated by shape and dimension," finished heat sinks "are also characterized by their thermal resistance properties." *Id.* Finished heat sinks are in fact "certified to perform within thermal resistance parameters." *Id.* And although "these thermal resistance properties are not visible, they are clearly relevant to the customers for whom" finished heat sinks "have been designed," as they make finished heat sinks "precisely or optimally suited to cool the specific electronic devices for which they have been designed." *Id.*

Drawing on these distinctions, the Commission ultimately defined finished heat sinks by distinguishing them from "fabricated" heat sinks. A fabricated heat sink, the Commission explained, is "any heat sink blank that has been cut-to-length, precision machined, {and/or} otherwise fabricated to the end product specifications, but not yet tested, assembled into other materials, or packaged." *Aluminum Extrusions Fair Trade Comm.* 1371-72, 36 C.I.T. By contrast, a finished heat sink is "the final product ready to be sold to electronic manufacturers. Finished heat sinks differ from fabricated heat sinks in that they have been fully test{ed} and assured to comply with the required end-use specifications." *Id.* at 1372. The Commission later combined these two definitions into one, defining finished heat sinks as "fabricated heat sinks, sold to electronics manufacturers, the design and production of which are organized around meeting certain specific thermal performance requirements and which have been fully, albeit not necessarily individually,

4

tested to comply with such requirements." *Id.* (quoting *Certain Aluminum Extrusions from China,* 76 Fed. Reg. 29,007, 29,008 n.4 (ITC May 19, 2011)).

## II. Commerce's Antidumping and Countervailing Duty Orders on Chinese Aluminum Extrusions Exclude Finished Heat Sinks From Their Scope

In light of the Commission's determination, the U.S. Department of Commerce issued antidumping and countervailing duty orders on Chinese aluminum extrusions, but excluded finished heat sinks from their scope. Antidumping Duty Order, 76 Fed. Reg. 30,650; Countervailing Duty Order, 76 Fed. Reg. 30,653. The Orders contain identical exclusionary language for finished heat sinks:

> Also excluded from the scope of this order are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654. The exclusion language differs from the Commission's definition only in that the phrase "sold to electronics manufacturers" is omitted. When this omission was challenged, Commerce explained that it was "a clarification" that did "not materially alter the scope of the exclusion." *Aluminum Extrusions Fair Trade Comm. v. United States*, 968 F. Supp. 2d 1244, 1251 (Ct. Int'l Trade 2014) (upholding Commerce's deviation).

Commerce's Orders also repeated the Commission's understanding of the distinctions between heat sink blanks, fabricated heat sinks, and finished heat sinks. "Heat sink blanks," the Orders explain, "are the full length aluminum extrusions used to produce finished heat sinks." Antidumping Duty Order, 76 Fed. Reg. at 30,650; Countervailing Duty Order, 76 Fed. Reg. at 30,653. They "are generally the pre-fabricated, pre-tested inputs in the production of heat sinks (post any stretching or aging processes applied)." *Id.* "Fabricated heat sinks are generally

understood to be any heat sink blank that has been cut-to-length, precision machined, {and/or} otherwise fabricated to the end product specifications, but not yet tested, assembled onto other materials, or packaged." *Id.* And "{f}inished heat sinks differ from fabricated heat sinks in that they have been fully, albeit not necessarily individually, tested and assured to comply with the required thermal performance end-use specifications." *Id.*

## III. This Court Twice Rejects Commerce's Attempts to Narrow the Finished-Heat-Sink Exclusion

Despite the plain language of the finished-heat-sink exclusion, Commerce has resisted giving that language its full effect in scope rulings. Start with *Agilent Technologies*. There, the plaintiff was "a manufacturer of electronic and bio-analytical measurement instruments" that sought a scope ruling on its "mass filter radiator," a type of heat sink. *Agilent Techs. v. United States*, 256 F. Supp. 3d 1338, 1339 (Ct. Int'l Trade 2017). Commerce, in its final scope ruling, "concluded that Agilent failed to establish with evidence on the record that the {heat sink} was designed 'around meeting specific thermal performance requirements' and was sufficiently 'tested to meet such specific thermal performance requirements.'" *Id.* at 1341. But Commerce failed to "explain why the description of thermal performance requirements contained in Agilent's submissions … were insufficient to satisfy the thermal performance test of the exclusion." *Id.* at 1345. The best it could do was discount the plaintiff's evidence because it was not contemporaneous—it postdated the heat sink's design by 15 years—but this Court was "not convinced that it was reasonable for Commerce" to do so. *Id.*

On remand, Commerce again concluded that the plaintiff's heat sink did not qualify for the exclusion "because it was not designed and produced to meet specified thermal performance requirements and was not tested for compliance with specified design requirements." *Agilent*, 335 F. Supp. 3d at 1347, 1351. This Court once again held that conclusion unsupported by substantial

evidence. *Id.* at 1354. Commerce had unreasonably "discounted Agilent's evidence of a target quadrupole temperature of 200 degrees Celsius for the {heat sink} to pass user-selected tests, and evidence of dimensional or other physical tolerances that were designed to meet specified thermal performance requirements." *Id.* And a prior scope ruling on which Commerce relied, the ECCO scope ruling, did "not definitively answer the question of whether Agilent's {heat sink} is excluded from the scope of the Orders." *Id.* This Court remanded to Commerce for reconsideration, suggesting that it consider the (k)(2) factors. *Id.* at 1355. The case ultimately settled. *Agilent Techs. v. United States*, Court No. 16-00183, Joint Stipulation for Entry of Judgment, ECF No. 72 (Ct. Int'l Trade July 24, 2019).

Next came *Wagner Spray Tech*. There, the plaintiff sought a scope ruling on a heat sink that formed part of its paint sprayers. *Wagner Spray Tech*, 779 F. Supp. 3d at 1311, 1314. The plaintiff submitted evidence that the heat sink was (1) "designed with geometric tolerancing" for 1/1000 of an inch per inch "flatness," (2) "custom designed for use exclusively in {its} Titan 440 line of paint sprayers," (3) "designed to satisfy {Underwriters Laboratories'} 1450 temperature test requirements," and (4) "thermal test{ed}" within "an assembled paint sprayer." *Id.* at 1316 (quotations omitted). Among other reasons, Commerce concluded that the heat sink did not qualify for the Orders' exclusion because the plaintiff "had failed to show that it satisfied specified thermal performance requirements for which the product was designed, produced, and tested." *Id.* at 1319. In particular, Commerce reasoned that the plaintiff "was required to show that specific thermal performance requirements existed for the heat sink itself, separate from that of any downstream product or component." *Id.* at 1318–19.

This Court rejected Commerce's reasoning as "impermissibly chang{ing} the scope of the Orders." *Id.* at 1325. "The scope exclusion language does not mention downstream products and

does not prohibit the thermal performance requirements from being tied to a downstream product; the exclusion language merely states that 'the design and production of which are organized around meeting certain specific thermal performance requirements.'" *Id.* (quoting the Orders). Indeed, "{a}t no point did the {ITC Final Report} state that the finished heat sinks themselves must operate independently within a specified range. The context of this requirement implies that the thermal resistance properties are instead directly related to 'the specific electronic devices for which they have been designed.'" *Id.* at 1326 (quoting the ITC Final Report).

Moreover, the same was true for testing. Although Commerce concluded that the plaintiff failed to demonstrate that the heat sink itself had been tested for compliance with thermal performance specifications, this Court disagreed. *Id.* at 1328. The plaintiff did in fact submit evidence that the heat sinks were tested within the paint sprayers for which they were specifically designed. *Id.* This Court remanded to Commerce for reconsideration, but the parties plan to settle the case. *See Wagner Spray Tech Corp. v. United States*, Court No. 23-00241, Joint Status Report, ECF No. 50 (Ct. Int'l Trade Jan. 8, 2026).

## IV.    Commerce Nevertheless Determines that the Finished-Heat-Sink Exclusion Does Not Cover IPG's Laser Heat Sinks

IPG "manufactures fiber lasers for scientific, research, biomedical and other advanced applications." Final Scope Ruling at 7. At issue in this case are four models of "aluminum heat sinks, manufactured from aluminum extrusions, designed to be used in IPG's fiber laser modules for heat dissipation." *Id.*

Initially, IPG contacted a foreign manufacturer of heat sinks to determine if it "would be capable of manufacturing heat sinks to meet the specific thermal requirements" of IPG's lasers. Scope Ruling Application at 20. IPG provided this manufacturer the "original thermal resistance

8

characteristics required for the heat sinks." *Id.* at 15 & Att. 2.[1]  IPG determined these characteristics by determining "the required thermal performance standards and then design{ing} the measurements of each heat sink so that the standards could be met."  *Id.*  "Low thermal resistance, mounting surfaces on both sides of the radiator and compact geometric dimensions were requirements that IPG specified …."  *Id.*  The manufacturer then produced heat sinks that met IPG's specifications.  *Id.* at 8–9.  IPG confirmed that the heat sinks met its specifications by testing them within a laser.  *Id.* at 15 & Att. 9.

This same process played out when IPG later switched suppliers.  It engaged a Chinese manufacturer to make heat sinks to the specifications required by IPG's lasers, including requisite form factor and contact points.  *Id.* at 16, 20 & Att. 1.  IPG then tested a Chinese-made prototype within a laser and compared it to a predecessor heat sink.  *Id.* at 16.  Testing revealed that the Chinese-made prototype functioned and performed similarly to the predecessor heat sink and was thus acceptable for use in IPG's lasers.  *Id.*

As their development history demonstrates, the subject heat sinks are not off-the-shelf products.  They "are used solely by IPG Photonics for manufacturing {its} fiber lasers," and consequently "are not advertised, displayed {or} packaged for sale."  Scope Ruling Application at 9, 23.  Indeed, "{t}he heat sinks were designed for maximum compactness with sufficient surface area for mounting the cooled elements and for sufficiently low thermal resistances" within IPG's

---

[1] "[                                                                          ]"  Scope Ruling Application at 6.

**NONCONFIDENTIAL**

lasers. *Id.* at 7. The four heat sink models at issue are thus produced to specific dimensions—measured in millimeters—and "have a flat surface tolerance" of less than .008 inches.[2] *Id.* at 5.

After importation, IPG "incorporates the {heat sinks} into the faber laser modules it manufactures." Final Scope Ruling at 7. There is no record evidence that IPG modifies the heat sinks in any way after importation (for example, that it cuts them to length, precision-machines them, or otherwise fabricates them). The heat sinks, once incorporated into IPG's lasers, "draw heat away from the laser to ensure that when in use, the laser does not overheat." *Id.* Every laser IPG makes is then tested for power output stability and laser module temperature stability. Scope Ruling Application, Att. 11, 12, 13, 14. The lasers must remain under a certain temperature to prove compliance—if they do not, "then the heat sink is not functioning properly." *Id.*

In other words, just as in *Wagner Spray Tech*, the record evidence shows that heat sinks are designed specifically for IPG's lasers, have thermal performance requirements tied to those "downstream product{s}," and are fully tested for compliance with those requirements within such products. *Wagner Spray Tech,* 779 F. Supp. 3d at 1325, 1328.

Commerce nevertheless concluded that IPG's heat sinks for its lasers were not "finished heat sinks" within the meaning of the Orders' exclusion language. First, Commerce claimed that IPG's heat sinks were not "designed and produced to meet specified thermal performance requirements." Final Scope Ruling at 17. IPG's documentation, Commerce said, was "merely general in nature and not specific to the products at issue imported by IPG," *id.* at 18—even though that documentation provided substantial evidence that all IPG's lasers require specially designed heat

---

[2] The surface widths of the subject heat sinks range from [
        ], meaning that their flat surface tolerances range from [                    ] inches per inch at most. *See* Scope Ruling Application at 5.

sinks.  Scope Ruling Application, Att. 2, 8, 9, 10.  Commerce also discounted this evidence because a predecessor heat sink had different dimensions and was made from a different aluminum alloy than the subject heat sinks.  Final Scope Ruling at 19–21.  But Commerce did not explain why these differences in dimensions or chemical composition mattered, again missing the bottom-line point that each IPG laser requires a tailor-made heat sink.

Second, Commerce also concluded that IPG's heat sinks were not "fully tested to ensure compliance with specified thermal performance requirements."  *Id.* at 21.  It reiterated its quibbles about dimensional and chemical differences, then disregarded IPG's evidence as "mere{} testing to measure thermal performance" rather than "testing to comply with thermal performance require-ments."  *Id.* at 21–22.  But it did not explain how one might "test{} to comply with thermal per-formance requirements" if not by "testing to measure thermal performance."  Additionally, Com-merce chastised IPG for submitting evidence of testing that occurred "just weeks before IPG sub-mitted its Scope Application."  *Id.* at 23.  But in the same breath, it concluded that IPG failed "to provide any tangible post-production thermal testing" ostensibly required by exclusion language that makes no mention of "tangible" post-production testing.[3]  *Id.* at 24.

Commerce's Final Scope Ruling was issued on August 27, 2025.  On September 26, 2025, IPG timely filed a summons within 30 days of the Final Scope Ruling, ECF No. 1, and on October 24, 2025, timely filed a complaint within 30 days of filing a summons, ECF No. 13.  19 U.S.C. § 1516a(a)(2)(A)(ii); 28 U.S.C. § 2636(c); USCIT Rule 3(a)(2).

---

[3] This requirement is seemingly invented by Commerce. IPG submitted such evidence to the extent legally necessary and, if more significant evidence of the IPG testing program was required, IPG could and would have provided it.

## STANDARD OF REVIEW

Commerce's decisions as to "whether a particular type of merchandise is within the class or kind of merchandise described in an … antidumping or countervailing duty order" are subject to this Court's review.  19 U.S.C. § 1516a(a)(2)(B)(vi).  "The court shall hold unlawful any determination … found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C § 1516a(b)(1)(B)(i).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1307 (Fed. Cir. 2018) (quotation omitted).

Commerce's regulations set forth the two-step procedure that it must use when deciding whether a particular good is within the scope of an antidumping or countervailing duty order.  *See* 19 C.F.R. § 351.225.  First, "Commerce must look to the text of an order's scope{.}" *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017).  After all, Commerce may not "interpret orders contrary to their terms."  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998).  In interpreting the language of an order, Commerce may consider "(k)(1) sources" for clarification.  These "primary interpretive sources" include, among other things, "prior scope rulings," "descriptions of the merchandise contained in the petition," and merchandise descriptions in the "initial investigation pertaining to the order at issue."  19 C.F.R. § 351.225(k)(1)(i).  Commerce "may also consider secondary interpretive sources," like "Customs rulings," "industry usage, dictionaries, and any other relevant record evidence," though the primary sources "will normally govern" over conflicting secondary sources.  19 C.F.R § 351.225(k)(1)(ii).

Second, if Commerce determines that these (k)(1) sources are "not dispositive," it "will then further consider" the five "(k)(2) factors."  These factors consist of the "physical

characteristics (including chemical, dimensional, and technical characteristics) of the product";
"expectations of the ultimate users"; "ultimate use of the product"; "channels of trade in which the
product is sold"; and "manner in which the product is advertised and displayed."  19 C.F.R.
§ 351.225(k)(2)(i); *see Diversified Prods. Corp. v. United States*, 572 F. Supp. 883, 889 (Ct. Int'l
Trade 1983).  The physical characteristics of the product "will normally be allotted greater weight
than the other factors" in "the event of a conflict" between them.  19 C.F.R. § 351.225(k)(2)(ii).

## SUMMARY OF ARGUMENT

The plain language of the Orders' finished-heat-sink exclusion covers IPG's heat sinks.
The record evidence shows both that IPG's lasers require specially made heat sinks with particular
dimensions to achieve specified thermal performance requirements, and that IPG fully tested its
lasers for compliance with those requirements.  And even if the language of the exclusion were
unclear (it is not), both the (k)(1) sources and the (k)(2) factors confirm that IPG's heat sinks are
precisely the sort of "finished" heat sinks (rather than mere "fabricated" heat sinks) ready for use
in electronic products that the Commission determined were not injuring the domestic industry.

Commerce's determination otherwise is unsupported by substantial evidence and otherwise
not in accordance with law.  With respect to the heat sinks' design, Commerce discounted some of
IPG's evidence on the grounds that it was too "general" and concerned a predecessor heat sink
with different dimensions and chemical composition.  But that was unreasonable.  Commerce
failed to explain at all why the evidence's purported generality, or differences in dimensions and
composition, might matter.  The obvious point that the record establishes, nitpicking aside, is that
each of IPG's lasers requires a heat sink with particular dimensions that can perform within spec-
ified temperature parameters—or, in other words, that each laser needs a finished heat sink to
properly function.

And with respect to testing, Commerce's newfound "tangible" "post-production" thermal testing requirement is inconsistent with the plain language of the Orders' exclusion. The exclusion requires merely that heat sinks be "fully, albeit not necessarily individually, tested to comply with" specified thermal performance requirements. The record evidence shows that IPG's heat sinks were fully tested within their corresponding lasers. Commerce cannot reasonably ignore that evidence by characterizing it as "intangible," too close in time to the scope application, or "mere{} testing to measure thermal performance."

Because Commerce unreasonably ignored IPG's evidence and misinterpreted the Orders, this Court should remand for reconsideration.

## ARGUMENT

### I. The Orders' Finished-Heat-Sink Exclusion Covers IPG's Heat Sinks

The Orders exclude IPG's heat sinks from their scope. As noted, the relevant exclusion provides that "finished heat sinks"— "fabricated heat sinks ... the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements"—are "excluded from the scope of" the Orders. Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654. This exclusion covers IPG's heat sinks three times over: first, under the exclusion's unambiguous language; second, after consulting the (k)(1) sources; and third, after considering the (k)(2) factors.

#### A. Each IPG Heat Sink was Designed to Meet, and Fully Tested for Compliance With, its Corresponding Laser's Thermal Performance Requirements

The unambiguous language of the exclusion controls. The record evidence demonstrates that the subject heat sinks were designed and produced to meet specific thermal performance requirements and fully tested for compliance with those requirements within IPG's lasers.

14

First, the record demonstrates that all IPG's lasers require heat sinks specially designed to meet specified thermal performance requirements.  To start, IPG engaged a foreign supplier to make a heat sink to its thermal performance specifications and tested that heat sink within a laser to ensure compliance with those specifications.  Scope Ruling Application at 6, 15 & Att. 2, 9.  IPG then repeated that same process with its Chinese supplier, which developed a substantially similar prototype that IPG then tested in a laser for compliance with IPG's thermal performance requirements.  *Id.* at 16, 20 & Att. 13, 14.

Second, the record likewise demonstrates that all IPG's lasers, including the finished heat sinks contained within them, are tested for compliance with IPG's thermal performance requirements.  As noted above, during the prototype stage, both manufacturers' heat sinks were tested for compliance with IPG's requirements.  And, as no one disputes, IPG tests every laser that it makes, post-production, for power output stability and laser module temperature stability—that is, to ensure that a laser does not exceed a specified temperature when in use.  *Id.*, Att. 11, 12, 13, 14.

And third, combining all that together, the record necessarily demonstrates that the subject heat sinks were designed and fully tested to meet specified thermal performance requirements.  The subject heat sinks are undisputedly not off-the-shelf products but rather used only in IPG's lasers—lasers that, as established, require tailor-made heat sinks.  *Id.* at 9, 23.  The subject heat sinks, moreover, are produced to specific millimetric dimensions and have razor-thin flat surface tolerances, to fit specially within IPG's lasers.  *Id.* at 5.  And the subject heat sinks, after incorporation into those lasers, were necessarily tested for compliance with IPG's thermal performance requirements.  *Id.*, Att. 13, 14.

All this constitutes substantial evidence that IPG's heat sinks are "finished heat sinks" within the meaning of the Orders' exclusion.  Direct evidence as to each individual heat sink is not

necessary. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960). The substantial evidence standard thus allows for "reasonable inferences from the record." *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quotation omitted). Even the Orders themselves recognize that direct evidence as to specific imports is not required— the exclusion speaks of "full{}," but not "individual{}," testing. Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654. And here, the only reasonable inference from the record is that the subject heat sinks were designed and fully tested to meet IPG's lasers' thermal performance requirements.

## B. The (k)(1) Sources Confirm that IPG's Heat Sinks are Covered by the Exclusion's Plain Language

Even if the Orders were unclear (and they are not), the (k)(1) sources confirm that the subject heat sinks are described by the Orders' exclusion. Recall that Commerce's regulations consider merchandise descriptions in the "initial investigation pertaining to the order at issue" a "primary interpretive source{}." 19 C.F.R. § 351.225(k)(1)(i). In this case, that primary source— the Commission's final report—shows that IPG's heat sinks are "finished heat sinks."

Specifically, the Commission identified two factors that distinguished finished heat sinks from ordinary aluminum extrusions. As the Commission saw it, it is not heat sinks' "metallurgic chemistry" or "custom shape{}" that differentiates them from an aluminum extrusion but rather "the specific and precise tolerances to which they are generally produced" and "their customized thermal resistance properties." ITC Final Report at 1. Finished heat sinks "are designed to remove damaging heat from electronic equipment," with a "flat surface tolerance" that is "often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions." *Id.* And finished heat sinks are "certified to perform within thermal resistance parameters,"

which may not be "visible," but are "clearly relevant to the customers" whose "specific electronic devices" finished heat sinks have been "precisely or optimally suited to cool." *Id.* In short, the Commission understood a finished heat sink to be "the final product ready to be sold to electronic manufacturers." *Aluminum Extrusions Fair Trade Comm.*, 36 C.I.T. at 1371–72.

The Commission's description clarifies that IPG's heat sinks are finished heat sinks within the meaning of the Orders' exclusion. Just as in the Commission's report, IPG's heat sinks are produced to "specific and precise tolerances": their dimensions are specific within fractions of a millimeter, and their flat surface tolerances are within, or close to, those referenced by the Commission. Just as in the Commission's report, IPG's heat sinks are "certified to perform within thermal resistance parameters": they are tested to confirm that they do not heat past a certain temperature threshold within a laser. And just as in the Commissioner's report, IPG's heat sinks are "the final product ready to be sold to electronic manufacturers": they are only sold to IPG, not advertised or marketed generally, and designed specially to work in IPG's lasers.

## C. The (k)(2) Factors Likewise Confirm that IPG's Heat Sinks are Finished Heat Sinks Covered by the Exclusion

Finally, even if the (k)(1) sources do not show that IPG's heat sinks fall within the scope of the exclusion, the (k)(2) factors do. The "physical characteristics (including chemical, dimensional, and technical characteristics) of the product"; "expectations of the ultimate users"; "ultimate use of the product"; "channels of trade in which the product is sold"; and "manner in which the product is advertised and displayed" all demonstrate that IPG's heat sinks are "finished heat sinks." 19 C.F.R. § 351.225(k)(2)(i).

Start with the most important factor, physical characteristics. IPG's heat sinks have the same physical characteristics as the finished heat sinks described in the Orders' exclusion and the Commission's report. They are made to precise dimensional tolerances—within fractions of a

millimeter.  They have razor-thin flat surface tolerances, ensuring sufficient contact with heat-generating components within a laser.  And they perform to specified thermal performance requirements, preventing lasers from heating beyond a certain temperature.  Additionally, the subject heat sinks, like the finished heat sinks described in the exclusion and the Commission's report, have all the physical characteristics necessary to be used by an electronic products manufacturer without further work.  Accordingly, the physical characteristics of the subject heat sinks show that they are of the same class or kind as the "finished heat sinks" excluded from the Orders.

Moreover, each of the remaining factors shows that IPG's heat sinks are of the same class or kind as the finished heat sinks described in the Orders' exclusion.  The only ultimate user of the subject heat sinks is IPG, and the only expectation it has is that the subject heat sink is ready for incorporation into IPG's lasers to meet the thermal performance requirements for which the heat sinks were designed.  Indeed, IPG tests every laser to ensure that the heat sinks within them perform to IPG's standards.  For the same reasons, the channels of trade and manner of sale weigh in IPG's favor:  the subject heat sinks only are sold from the Chinese supplier, a manufacturer of finished heat sinks, to IPG, a manufacturer of electronic products (specifically, lasers), and the heat sinks are not otherwise advertised or marketed.

As such, the (k)(2) factors all weigh in favor of IPG's heat sinks falling within the exclusion in the Orders for "finished heat sinks."

## II.    Commerce's Determination that IPG's Heat Sinks Fall Within the Orders' Scope is Unsupported by Substantial Evidence and is Otherwise Contrary to Law

Commerce's determination otherwise—that IPG's heat sinks specially designed for its lasers were not, in fact, "finished heat sinks"—is unsupported by substantial evidence and otherwise contrary to law.  Specifically, with respect to the heat sinks' design and testing, Commerce unreasonably rejected IPG's evidence as "general" or distinguishable on immaterial grounds.  IPG's

18

evidence, even if "general" or concerning predecessor and prototype heat sinks, simply showed that all IPG's lasers require a customized heat sink designed specially to fit within the laser and meet IPG's specific thermal performance requirements. And with respect to the heat sinks' testing, Commerce both misinterpreted the Orders to require "tangible" "post-production" testing and unreasonably discounted IPG's evidence of both pre- and post-production testing of prototype heat sinks and each and every laser that IPG produces.

### A. Commerce Unreasonably Discounted Evidence Detailing the Lengths to Which Heat Sinks for IPG's Lasers Must be Customized

Commerce's first determination—that IPG's heat sinks were not designed or produced to meet "certain specified thermal performance requirements"—is unsupported by substantial evidence. As discussed above, IPG provided evidence that (1) it supplied its original manufacturer with specific thermal performance requirements, (2) the original manufacturer designed and produced a heat sink to meet those requirements, (3) IPG tested this predecessor heat sink to ensure that its performance met IPG's requirements, (4) IPG repeated this procedure with a prototype made by a Chinese supplier, which produced the subject heat sinks, (5) IPG tested its lasers containing the subject heat sinks to ensure that they did not surpass a particular temperature, and (6) the heat sinks have fraction-of-a-millimeter-specific dimensions with even more minute flat surface tolerances.

Notably, Commerce failed to engage at all with those last two points—that lasers containing the subject heat sinks must not heat above a certain temperature, and that the subject heat sinks are made to precise dimensions with razor-thin flat surface tolerances. That failure alone deems Commerce's determination unreasonable under *Agilent*'s reasoning. The plaintiff in *Agilent*, just like IPG here, submitted evidence of a "target … temperature" and "of dimensional" and "other physical tolerances that were designed to meet specified thermal performance requirements."

*Agilent,* 335 F. Supp. 3d at 1354.  In was unreasonable in *Agilent* for Commerce to "discount" that evidence as insufficient to show the requisite design and production.  *Id.*  So too here—especially given that Commerce failed to engage with this evidence at all.  *See, e.g.*, *Suzano S.A. v. United States*, 589 F. Supp. 3d 1225, 1237 (Ct. Int'l Trade 2022) (remanding to Commerce "because it failed to consider the record evidence which reasonably detracted from its conclusion").

Instead, in deciding that IPG's heat sinks were not designed or produced to meet specified thermal performance requirements, Commerce pointed to the purported "generality" of some of IPG's evidence, and on distinctions in dimensions and chemical composition between the predecessor heat sink and the subject heat sinks.  *See* Final Scope Ruling 17–21.  Neither withstands scrutiny.

To start, Commerce's "generality" focus does not bear scrutiny.  Commerce discounted some of IPG's documentary evidence because it was "merely general in nature and not specific to the products at issue imported by IPG."  Final Scope Ruling at 18–19 (discussing Attachments 2, 8, and 9).  But Commerce missed the point.  As IPG explained in both its application and its rebuttal, "the information provided regarding the prior heat sink simply establishes the extensive customization and unique testing required in order to source heat sinks for IPG Photonics' laser modules."  Rebuttal Comments at 5; Scope Ruling Application at 8.  "This effort was transitioned to the {Chinese} supplier of the {subject} heat sinks{.}"  Rebuttal Comments at 5; Scope Ruling Application at 8–9.  In short, the evidence that Commerce derided as too "general" was offered to establish the specific point that, as a rule, heat sinks for IPG's laser must meet specific dimensional and performance requirements.  And not only did Commerce miss that point, but it also compounded that error by failing to account for those specific dimensional and performance requirements at all in its "generality" analysis.

20

For the same reasons, Commerce's focus on distinctions in dimensions and chemical compositions between the predecessor heat sink and the subject heat sinks, Final Scope Ruling at 19–20, misses the mark. And if anything, Commerce's gripes on this score *support*, rather than undermine, IPG's position. Commerce's apparent recognition that the dimensions of a heat sink matter, *see id.* at 19, is a welcome embrace of this Court's decision in *Agilent* and departure from Commerce's ECCO scope ruling. But again, Commerce did not explain why the specific dimensional requirements of the subject heat sinks, being different from the predecessor heat sink, somehow failed to evince specific thermal performance requirements. That the dimensions differ in fact supports IPG's point that its heat sinks are tailor-made to meet thermal performance requirements within particular lasers.

And as for chemical composition, Commerce offered no explanation as to why the difference in aluminum alloy between the predecessor heat sink and the subject heat sinks mattered. *See* Final Scope Ruling at 19–20. It is true that "the thermal performance of a heat sink is determined by the geometry and material of the heat sink." Scope Ruling Application at 16. But IPG's evidence establishes that the Chinese prototype that became the subject heat sinks was produced with an alloy that performed just as well or better than the predecessor's alloy. *Id.*, Att. 14 ¶ 7. And there is no contrary record evidence. In short, it is unreasonable for Commerce to ignore the point for which IPG submitted evidence, nitpick that evidence on grounds unrelated to that point, and then fail to address contrary evidence undermining that nitpicking.

Finally, Commerce also claimed, when discussing IPG's evidence of its testing, that "IPG did not create the products at issue based on specified thermal requirements; rather, it selected an existing design and performed tests to ensure acceptable levels compliance." Final Scope Ruling at 22. But Commerce rightly did not use that reasoning in attempting to justify its decision as to

21

the heat sinks' design and production.  *Id.* at 17–21; *see also Assan Aluminyum Sanayi ve Ticaret A. S. v. United States*, 789 F. Supp. 3d 1257, 1271–72 (Ct. Int'l Trade 2025) ("{A}n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943))).  For one, it is not accurate.  The "existing design" language that Commerce para-phrased from IPG's application was in fact referring to a "prototype," as the record evidence demonstrates.  Scope Ruling Application at 16 & Att. 14.[4]  Rather than engage with that evidence, Commerce overlooked it.  *See, e.g.*, *Suzano*, 589 F. Supp. 3d at 1237.

For another, even if it were true that IPG's heat sinks were an unrelated "preexisting" de-sign (it is not), there is no requirement in the Orders' text that a finished heat sink be designed and produced *by* or *for* a specific importer.  *Cf. Wagner Spray Tech.*, 779 F. Supp. 3d at 1385 (holding unreasonable Commerce's "impermissibly chang{ing} the scope of the Orders").  The requirement is that a finished heat sink be designed and produced to meet "certain specified thermal perfor-mance requirements."  And the record evidence here shows just that.  The purported "existing design" both met IPG's requirements and was substantially similar to a predecessor heat sink spe-cially designed for IPG, demonstrating that it was designed and produced to meet specific thermal performance requirements—even if those requirements were not originally IPG's.  That an osten-sibly preexisting heat sink was not designed or produced for a particular importer thus does not

---

[4] [

] Scope Ruling Application, Att. 14 ¶¶ 3, 8.

mean that it was not designed or produced to meet specific thermal performance requirements. Commerce's passing, unreasoned conclusion otherwise is unsupported by substantial evidence.

### B. Commerce Unreasonably Ignored IPG's Evidence of Downstream Thermal Performance Testing, Imposing a "Tangibility" Requirement not Found in the Exclusion

Commerce's second determination—that IPG's heat sinks were not "fully … tested to comply with" specified thermal performance requirements—likewise is unsupported by substantial evidence. Recall that IPG submitted evidence that all its lasers are "tested post-production, with the heat sinks inside the lasers, to confirm that each heat sink in each laser meets IPG Photonics' thermal performance requirements." Rebuttal Comments at 6; Scope Ruling Application, Att. 13, 14.

Commerce, however, unreasonably disregarded IPG's evidence on many of the same grounds already addressed above: that certain evidence of testing concerned predecessor or other heat sinks, which had different dimensions and compositions. Final Scope Ruling at 21–23. Again, this evidence simply shows that when IPG works with a manufacturer to obtain heat sinks for its lasers, it fully tests those heat sinks for compliance with specified thermal performance requirements. And again, Commerce neglected to address evidence that IPG fully tests all its lasers containing heat sinks to ensure that they meet IPG's thermal performance requirements. Scope Ruling Application, Att. 13, 14. Just as in *Wagner Spray Tech.*, Commerce's failure to engage with this evidence of full downstream-product testing warrants remand. *Wagner Spray Tech,* 779 F. Supp. 3d at 1328.

Commerce's other reasons for discounting IPG's evidence are just as unconvincing. For instance, in response to evidence demonstrating that IPG tested the Chinese-made prototype heat sink to confirm that it functioned and performed similarly to the predecessor heat sink, Commerce claimed that "this description does not demonstrate testing to comply with thermal performance

requirements; rather this is merely testing to measure thermal performance."  Final Scope Ruling at 22.  But Commerce never explained how one can test for compliance with thermal performance requirements without testing to measure thermal performance.  *Id.*  Nor did it explain why one would test to measure thermal performance if not to ensure that some requirement has been met. *Id.*  Without more, Commerce's hair-splitting between testing for compliance and testing to measure performance is unreasonable.

Additionally, Commerce chastised IPG for submitting evidence of testing that occurred "just weeks before IPG submitted its Scope Application," finding such evidence "inherently insufficient."  Final Scope Ruling at 23.  There is nothing "inherently insufficient," however, about evidence simply because it was generated post-production and immediately pre-scope application.  Indeed, in *Agilent*, this Court rejected similar reasoning, doubting "that it was reasonable for Commerce" to discount evidence simply because it postdated a heat sink's design by 15 years.  *Agilent,* 256 F. Supp. 3d at 1345.

Commerce's treatment of this evidence is all the more unreasonable given its position that IPG was required "to provide … tangible *post-production* thermal testing."  Final Scope Ruling at 24 (emphasis added).  Of course, IPG did so: it provided substantial evidence that it fully tests heat sinks when developing them with manufacturers, then again after they are incorporated into lasers. Scope Ruling Application, Att. 13, 14.  Yet Commerce cannot in one breath demand post-production testing, then in the next complain that evidence of testing is "inherently sufficient" because it is post-production.  *See, e.g.*, *NSK, Ltd. v. United States*, 390 F.3d 1352, 1357–58 (Fed. Cir. 2004) (Commerce must "reasonably explain{}" its "internally inconsistent" decision-making).

Moreover, Commerce's interpretation of the Orders—that the exclusion requires "*tangible post-production thermal testing,*" Final Scope Ruling at 24 (emphasis added)—is wrong.  To start,

24

the exclusion says nothing of "tangibility"—whatever that might mean—just as they say nothing of downstream products. *Cf. Wagner Spray Tech.*, 779 F. Supp. 3d at 1385. But more importantly, the exclusions do not require any particular kind of testing other than "full{}" testing to ensure compliance with specified thermal performance requirements. In fact, the exclusion emphasizes that "individual{}" testing is not required. But requiring full post-production testing would, in effect, require individual testing. Commerce's newfound requirements that full testing be tangible and post-production are thus inconsistent with the plain language of the Orders and unlawful.

These purported requirements are also inconsistent with the Commission's understanding of finished heat sinks. As the Commission explained, "{s}pecialized equipment, including … testing equipment, and specialized design and data collection software, are used to design {finished heat sinks} and to produce prototypes.… Substantial thermal analysis and testing are associated with the *front end* of {finished heat sink} production." ITC Final Report at 8 (emphasis added). Commerce's interpretation of the exclusion thus ignores not only plain language but also the Commission's report.

In any event, IPG submitted evidence of both substantial pre-production and post-production testing for compliance with thermal performance requirements: evidence that, during the prototype production process, heat sinks are fully tested to confirm thermal performance requirements; and evidence that, after production, the subject heat sinks were individually tested within lasers to ensure compliance with those same thermal performance requirements. Commerce unreasonably disregarded that evidence for all the reasons discussed above, necessitating remand.

## **CONCLUSION**

For these reasons, Commerce's Final Scope Ruling was unsupported by substantial evidence and otherwise not in accordance with law.  The Court should remand this matter to Commerce for reconsideration.

Dated: March 3, 2026                              Respectfully submitted,

/s/ William F. Marshall
William F. Marshall
Sarah S. Sprinkle
Gregory G. Toth
Christopher D. Yankson
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0138
wmarshall@strtrade.com

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the word-limitation set forth in Standard Chambers

Procedure 2(B)(1), and contains 7,484 words.

/s/ William F. Marshall

Dated: March 3, 2026                                          William F. Marshall

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: GARY S. KATZMANN, JUDGE

| | |
|---|---|
| IPG PHOTONICS CORPORATION,<br>                              *Plaintiff*,<br><br>                    v.<br><br>UNITED STATES,<br><br>                              *Defendant*,<br><br>               and<br><br>ALUMINUM EXTRUSIONS FAIR TRADE<br>COMMITTEE,<br>                              *Defendant-Intervenor*. | Court No. 25-00212 |

## <u>ORDER</u>

Upon consideration of Plaintiff's Motion for Judgment on the Agency Record, and upon all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiff's Motion is granted; and it is further

**ORDERED** that this matter is remanded to the U.S. Department of Commerce for further proceedings consistent with this opinion.


Dated: _____                    _____
        New York, New York                                    Judge