Court No. 25-00212        NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |
|---|
| IPG PHOTONICS CORPORATION, <br><br>      Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>      Defendant, <br><br>      and <br><br> ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, <br><br>      Defendant-Intervenor. |

Before: Hon. Gary S. Katzmann, Judge

Court No. 25-00212

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages: 6-11

## <u>DEFENDANT-INTERVENOR ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Aluminum Extrusions Fair Trade Committee*

May 18, 2026

Court No. 25-00212                                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   RULE 56.2 STATEMENT ............................................................................. 1

     A.    Administrative Decision Under Review ................................................. 1

     B.    Issue Presented ...................................................................................... 1

III.  STATEMENT OF FACTS ............................................................................. 1

IV.  ARGUMENT ................................................................................................... 2

     A.    Legal Framework ................................................................................... 3

     B.    Commerce Reasonably Determined That IPG's Products Do Not
Meet the Requirements of the Finished Heat Sink Exclusion ............... 4

          1.    Commerce Reasonably Determined That the Design and
Production of IPG's Products Are Not Organized Around
Meeting Specified Thermal Performance Requirements ........................... 5

          2.    Commerce Reasonably Found That IPG's Products Have
Not Been Fully Tested to Comply with Specified Thermal
Performance Requirements ......................................................................... 10

V.   CONCLUSION ............................................................................................... 12

Court No. 25-00212                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001)...................................................................................3

*King Supply Co. v. United States*,
    674 F.3d 1343 (Fed. Cir. 2012)...................................................................................3

*Nippon Steel v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...................................................................................3

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*,
    101 F.4th 1310 (Fed. Cir. 2024) .................................................................................3

*Walgreen Co. of Deerfield, Ill. v. United States*,
    620 F.3d 1350 (Fed. Cir. 2010)...................................................................................3

*Whirlpool Corp. v. United States*,
    890 F.3d 1302 (Fed. Cir. 2018)................................................................................3, 4

**Regulations**

19 C.F.R. § 351.225(k)(1)....................................................................................................3

19 C.F.R. § 351.225(k)(2).................................................................................................4, 5

**Administrative Materials**

*Aluminum Extrusions from the People's Republic of China*,
    76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) ..............................1, 2, 4

*Aluminum Extrusions from the People's Republic of China*,
    76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) ..............................1, 2, 4

## I.      INTRODUCTION

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Defendant-Intervenor Aluminum Extrusions Fair Trade Committee (the "AEFTC") respectfully submits this brief in response to the 56.2 Motion for Judgment on the Agency Record filed by Plaintiff IPG Photonics Corporation ("Plaintiff" or "IPG"). *See* Pl.'s Mot. for J. on the Agency R., Pursuant to Rule 56.2 (Mar. 3, 2026), ECF No. 33 ("Pl. Motion").

## II.     RULE 56.2 STATEMENT

### A.      Administrative Decision Under Review

The administrative decision under review is the U.S. Department of Commerce's final scope ruling in Memorandum from John. C. Kalitka to Scott Fullerton, re: *Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on IPG Photonics Corporation's Heat Sinks* (Dep't Commerce Aug. 27, 2025) C.R. 5; P.R. 23 ("Final Scope Ruling").

### B.      Issue Presented

Whether Commerce's Final Scope Ruling, finding that IPG's products do not meet the finished heat sink exclusion requirements of the antidumping and countervailing duty orders on *Aluminum Extrusions from the People's Republic of China* and are therefore subject to the scope of the Orders is supported by substantial evidence and in accordance with law. *See generally*, Final Scope Ruling; *see also Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) (antidumping duty ord.) ("AD Order"); *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) (countervailing duty order) ("CVD Order") (collectively, the "Orders").

## III.    STATEMENT OF FACTS

Commerce issue antidumping and countervailing duty order on aluminum extrusions from China on May 26, 2011, which cover "aluminum extrusions which are shapes and forms, produced

by an extrusion process." *See generally*, Orders. The scope of the Orders contained an exclusion for "finished heat sinks" defined as "fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements." AD Order at 30, 651; CVD Order at 30,654. IPG submitted a scope ruling request on October 4, 2024 for certain "heat sink" products (the "Products") the company imports from China, arguing that the Products satisfy the requirements for the finished heat sink exclusion and should therefore be excluded from the scope. *See* Letter from Sandler, Travis & Rosenberg, P.A. to Sec'y Commerce, re: *Aluminum Extrusions from the People's Republic of China: Scope Ruling Application for IPG Photonics Corporation* (Oct. 4, 2024) C.R. 1; P.R. 1. ("IPG Photonics Scope Ruling Request"). On August 27, 2025, Commerce issued its final scope ruling, finding that IPG's Products do not meet the finished heat sink exclusion requirements and are therefore covered by the scope of the Orders. *See* Final Scope Ruling at 34.

## IV.    ARGUMENT

Contrary to Plaintiff's claims, Commerce's final scope ruling confirming that IPG's Products are included in the scope of the Orders was supported by substantial evidence and in accordance with law. Commerce correctly determined that the general scope language cover IPG's Products, which cannot be excluded from the scope as "finished heat sinks" because they do not meet each of the specific requirements of the finished heat sink exclusion, as defined by the scope of the Orders. Plaintiff has provided the Court with no grounds on which to overturn Commerce's decision, especially given the applicable standard of review in appeals of the agency's scope rulings. *See King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (nothing that, in reviewing scope rulings, the Court must give Commerce "substantial deference with regard to

2

NON-CONFIDENTIAL VERSION

its interpretations of its own {AD} orders," which are "particularly within the expertise and special competence of Commerce.") (citations and quotations omitted). Indeed, under the substantial evidence standard, parties like IPG that challenge Commerce's scope rulings have "chosen a course with a high barrier to reversal." *Id.* at 1348 (quoting *Nippon Steel v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006)). Importantly, it is not enough for IPG to demonstrate that two inconsistent conclusions can be drawn from the record because "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310, 1323 (Fed. Cir. 2024) (quoting *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)). For the reasons below, Commerce's Final Scope Ruling was supported by substantial evidence and should be upheld.

A.    **Legal Framework**

In determining whether a product is within the scope of an order, Commerce will initially examine the language of the scope of the order at issue and the description of the product contained in the request for a scope ruling. *Walgreen Co. of Deerfield, Ill. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010); 19 C.F.R. § 351.225(k)(1). Commerce may then take into account the "(k)(1)" factors, including the descriptions of the merchandise contained in the petition pertaining to the order at issue and the initial investigation and the determinations of Commerce and the International Trade Commission (the "Commission"). 19 C.F.R. § 351.225(k)(1). The U.S. Court of Appeals for the Federal Circuit has explained that "under § 351.225(k)(1), {Commerce} must consider the scope language contained in the order, the descriptions contained in the petition, and how the scope was defined in the determinations issued by {Commerce} and the {Commission}." *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018). Only if Commerce deems

3

that these sources are not dispositive will Commerce consider five additional "(k)(2)" factors. *Id*.; 19 C.F.R. § 351.225(k)(2).

In this case, Commerce reasonably found that the scope language and Commerce's prior determinations are dispositive with respect to the product at issue. Final Scope Ruling at 15. IPG agrees that the language of the scope and the finished heat sink exclusion, in particular, is clear. Pl. Motion at 13. Therefore, it was unnecessary for Commerce to consider the additional factors in 19 C.F.R. § 351.225(k)(2). Final Scope Ruling at 15.

**B.      Commerce Reasonably Determined That IPG's Products Do Not Meet the Requirements of the Finished Heat Sink Exclusion**

The scope of the Orders has a narrow exclusion for certain "finished heat sinks." Finished heat sinks within the meaning of the Orders are:

> {F}abricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

*See* AD Order at 30,651; CVD Order at 30,654. Commerce clarified a five-part test for meeting the finished heat sink exclusion requirements: "(1) the product must be a fabricated heat sink {} made from aluminum extrusions; (2) specified thermal performance requirements must exist; (3) the product's design must have been organized around meeting those specified thermal performance requirements; (4) the product's production must be organized around meeting the specified thermal performance requirements; and (5) the product must have been fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements." Final Scope Ruling at 15-16 (internal quotations omitted) (citing Final Results of Redetermination Pursuant to Court Remand, *Agilent Technologies v. United States*, Ct. No. 16-00183 (Ct. Int'l

4

Trade Sep. 1, 2017) (Dec. 15, 2017) at 11 ("Agilent Remand Redetermination")).[1] Commerce reasonably analyzed each of these factors, determined that IPG's Products did not satisfy the requirements.

IPG takes issue with Commerce's determinations that (1) IPG's Products were not designed or produced to meet specified thermal requirements and that (2) IPG's Products were not tested for compliance with specified thermal performance requirements. Pl. Mot. at 19-25.

1.    **Commerce Reasonably Determined That the Design and Production of IPG's Products Are Not Organized Around Meeting Specified Thermal Performance Requirements**

Contrary to Plaintiff's claims, Commerce reasonably determined that the design and production of IPG's Products are not organized around meeting specified thermal performance requirements. *Id.* at 19-22. As the agency explained in its Final Scope Ruling, Commerce finds significance in the inclusion of the word "specified" in the scope's description of specific thermal performance requirements:

> {a}n interpretation of the term 'certain specified thermal performance requirements' {that} is so broad as to include all products that dissipate or transfer heat, or are intended to dissipate or transfer heat, would give no effect to the term 'specified' and would render this aspect of the finished heat sink exclusion superfluous in terms of distinguishing between finished heat sinks and subject heat sinks.

*See* Scope Ruling at 17. Commerce also found that the term "specified" implies that such thermal performance requirements must be specific and established prior to testing and confirmed by testing and that general thermal performance requirements that are not specified do not meet the

---

[1]    Following this remand, the Court of International Trade remanded the case again for the Department to consider what constituted specified thermal performance requirements under the 19 C.F.R. § 351.225(k)(2) analysis. While the appeal was settled before the Department filed its second remand redetermination, the Court's second slip opinion did not reject the Department's five-part test for what constitutes a finished heat sink.

scope exclusion requirements distinguishing between excluded finished heat sinks and subject heat

sinks. *Id.* at 17; Agilent Remand Redetermination at 19-21.

Commerce reasonably determined that IPG Photonics did not provide any actual evidence

of specific thermal requirements that existed before or during the development of the Products for

which it is requesting a scope exclusion. In the company's scope ruling application, IPG explained

that:

> in [                                                                    ] would be
> capable of manufacturing heat sinks to meet the specific thermal requirements. The
> documents provided support our position that the heat sinks were designed around
> specific thermal resistance requirements. This information was later provided to
> [        ] and their heat sinks meet these requirements.

IPG Photonics Scope Ruling Request at 20. The "documents" that IPG Photonics provided in

support of its claim that the Products were designed around specific thermal resistance

requirements are deficient in several respects and Commerce reasonably concluded that this

information was "merely general in nature and not specific to the products at issue imported by

IPG." Final Scope Ruling at 18.

For example, the information contained in the documentation is general and not specific to

IPG Photonics' imported Products. At Attachment 8 of IPG's scope ruling application, which

purportedly includes "the initial thermal specifications," IPG Photonics provides only "[



]." IPG Photonics Scope Ruling Request at

Attachment 8. Attachment 8 includes no reference to specific thermal requirements of the actual

Products (or even their alleged predecessors). Similarly, at Attachment 2, the company provides

"IPG Performance Requirements" (*id.* at Attachment 2) which were the "original thermal

6

resistance characteristics required for the heat sinks that was provided to [       ].” *Id.* at 15. But Attachment 2 is simply a [



]. *Id.* at Attachment 2. This [

] provided at

Attachment 9. *Id.* at Attachment 9. [



]." *Id.* Far

from the purposes for which IPG Photonics is citing it without context in Attachment 2, [       ]

appears to simply be a [



]." *Id.* Commerce reasonably concluded that this general

information is not evidence of specific thermal requirements for the Products at issue. Final Scope

Ruling at 18-19.

Indeed, the [

]. The length of the [

], and according to the report, "[

]." *Id.* at 19. In other words, this [

]. Even if the

[       ] heat sink was identical to the Chinese Products at issue—and for reasons Commerce

explained, as summarized below, they are not—the information IPG Photonics provided falls far

short of demonstrating "customized thermal resistance properties" or requirements that existed

before or during the development of the product that "continue to be integral to both the testing

and the production stages of the product's creation." IPG Photonics Scope Ruling Request at

Attachment 7 (pp. 9, 16); *see also* Agilent Remand Redetermination at 22.

As Commerce reasonably deduced, the performance evaluations of benchmarks

*approximating* the [          ] heat sink are further stripped of any probative value by the [

] between the [          ] heat sink and the Products at issue. At

Attachment 8, IPG Photonics provides [          ] product information which the company claims is

relevant to the original thermal resistance characteristics required for the heat sinks. At Attachment

10, IPG Photonics then attempts to link the [          ] heat sinks described in Attachment 8 to the

Chinese Products at issue. IPG Photonics Scope Ruling Request at 16. But when describing the

characteristics of the [          ] heat sinks in Attachment 8, the materials state that the [

]. *Id*. at Attachment

8. In contrast, IPG Photonics specifies that its heat sinks are made from series AL 6063-5

aluminum. *Id*. at 5. Thus, the chemical properties of the original [          ] heat sinks [

].

As Commerce noted, the dimensions are also different. Attachment 8 provides the

[                                         ]. *Id*. at Attachment 8. Notably, of

the four Products at issue, <u>zero</u> are within the [                                         ]. Indeed,

"three out of the four products at issue not only exceed this limit but two of them are more than

double the maximum width allowed." Final Scope Ruling at 20. Unsurprisingly, zero of the four

Products at issue have [

].

IPG now argues that these "distinctions in dimensions and chemical compositions between

the predecessor heat sink and the subject heat sinks" do not matter. Pl. Mot. at 20-21. For example,

8

IPG argues that "the Chinese prototype that became the subject heat sinks was produced with an alloy that performed just as well or better than the predecessor's alloy." *Id*. at 21. IPG also argues that the design of its Products was "substantially similar to a predecessor heat sink." *Id*. at 22. These arguments reveal the fatal flaw in IPG's analysis: IPG provided only general information regarding thermal performance requirements that are not *specific* to the Products at issue.

In this way, Commerce reasonably found that the information IPG Photonics provided is similar to information provided by the importer in the ECCO Group ("ECCO") scope inquiry. Final Scope Ruling at 21. In that case, ECCO claimed that the thermal performance requirements for heat sinks are not specified and that it designed its products to serve the thermal dissipation needs of the product to which they are affixed. *Id.* at Attachment 7 (p.19). ECCO claimed that the dimensions of its heat sinks constituted specified thermal performance requirements and that those specifications "create{d} a high enough thermal conductivity quotient sufficient to dissipate heat from the {end product}." *Id*. at Attachment 7 (p.21). Commerce found, though, that ECCO's discussion of the physical parameters of its products, including symmetry, twist, and flatness, did not demonstrate how those specifications serve the purpose of dissipating heat and therefore did not constitute specified thermal performance requirements. *Id*.

Commerce reasonably concluded that IPG Photonics' scope ruling request suffers from the same deficiencies as the ECCO scope ruling request. The company did not demonstrate that it had thermal performance requirements for the Chinese Products at issue or their purported [          ] predecessor. As such, the design and production of those heat sinks cannot be organized around meeting specified thermal performance requirements.

## 2.    Commerce Reasonably Found That IPG's Products Have Not Been Fully Tested to Comply with Specified Thermal Performance Requirements

Contrary to Plaintiff's claims, Commerce also reasonably found that IPG did not demonstrate that its products are fully tested to comply with specified thermal performance requirements. Pl. Mot. at 23-25. As Commerce explained, full testing involves:

> test{ing} to comply with thermal performance requirements, not simply test{ing} to measure thermal performance. In other words, the results of testing for compliance with the specified thermal performance requirements do not necessarily prove those were the specified thermal performance requirements around which the product was designed and manufactured in the first place.

Agilent Remand Redetermination at 37 (emphasis in original).

To support its claim that the Products were fully tested and that Commerce improperly found otherwise, IPG points testing performed on *different* products. Pl. Mot. at 23. As discussed above, IPG conducted [                    ] for [                    ]—none of which correspond to the dimensions of a "specific [      ] heat sink." Scope Ruling Application at 15. Furthermore, as Commerce rightly found, "any probative value this [          ] may have had in approximating the performance of the [      ] heat sink is mooted by the significant physical and chemical distinctions between the [          ] and the Products at issue." Final Scope Ruling at 19-20.

IPG also claims that it "tested the prototype heat sink and compared it to the [      ] heat sink" when switching suppliers from [

]. Scope Ruling Application at 16. But Commerce rightly concluded that this "testing" was not testing to comply with specific thermal performance requirements, and was instead, at best, testing to measure thermal performance. Final Scope Ruling at 22. This is not "hair-splitting" as

10

the Plaintiff claims. Pl. Mot. at 24. Instead, this is the core distinction between satisfactory and unsatisfactory testing for purposes of the finished heat sink exclusion.

In its Scope Ruling Application, IPG provided at "internal communications regarding the {prototype} testing which indicated that the [       ] heat sink functioned and performed similarly to the [     ] heat sink and was acceptable for the IPG laser." Scope Ruling Application at 16, Attachment 10. This is further evidence that IPG Photonics did not have specific thermal requirements for the Products at issue and did not design and produce the Products to meet those requirements. IPG Photonics admits that it "selected a heat sink with a design like the previously used heat sinks manufactured by Seifert" and then tested that heat sink to see if it "performed similarly to the [     ] heat sink" at an acceptable level. *Id*. at 16. This is similar to the scenario contemplated in the *Agilent* proceeding wherein Commerce determined that "<u>results</u> of testing for compliance with the specified thermal performance requirements do not necessarily prove those were the specified thermal performance requirements around which the product was designed and manufactured in the first place." *See* Agilent Remand Redetermination at 37 (emphasis in original). In this case, IPG Photonics did not design the Products around specific requirements; it simply chose a pre-existing design and "tested" for acceptable levels of compliance.

Commerce reasonably concluded that IPG Photonics' lack of post-production thermal testing further renders its products not excludable as "finished heat sinks." A summary of pre-production thermal testing on a single indeterminate prototype—which likely does not even correspond to the Products at issue—is clearly insufficient to satisfy the "finished heat sink" exclusion in the scope.

11

## V.    CONCLUSION

For the reasons detailed in Defendant's response, the AEFTC respectfully requests that the Court find the Department of Commerce's final scope ruling in the antidumping and countervailing duty orders on Aluminum Extrusions from the People's Republic of China to be supported by substantial evidence and in accordance with the law.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*

Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.
Paul A. Devamithran, Esq

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Aluminum Extrusions Fair Trade Committee*

May 18, 2026

12

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Aluminum Extrusions Fair Trade Committee's Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2026), is 3,864 words.

<u>      /s/ Robert E. DeFrancesco, III      </u>
(Signature of Attorney)

<u>    Robert E. DeFrancesco, III    </u>
(Name of Attorney)

<u>Aluminum Extrusions Fair Trade Committee</u>
(Representative Of)

<u>May 18, 2026</u>
(Date)