United States Court of International Trade
One Federal Plaza
New York, NY 10278



CHAMBERS OF
Gary S. Katzmann
JUDGE

July 7, 2026

William F. Marshall
Sandler, Travis & Rosenberg, P.A.
Trade Remedies
286 Madison Avenue, Suite 1200
New York, NY 10017

Collin T. Mathias
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

Robert E. DeFrancesco, III
Wiley Rein, LLP
2050 M Street, NW.
Washington, D.C. 20036

**Re:    Questions for Oral Argument re: <u>IPG Photonics Corp. v. United States</u>
          Court No. 25-00212**

Dear Counselors:

Oral argument in this case will be held in the James L. Watson Courthouse on Tuesday, July 28, 2026, in Courtroom 1 at 2:00 p.m. The argument, if public and not closed, will be recorded and may be made available to the public via the court's website. If you will be requesting a closed argument or portions of the argument, please inform my case manager, Geoffrey Goell, by 5:00 p.m. on Friday, July 24, 2026. The court encourages the parties to maintain a public argument if possible.

The court has reviewed the parties' briefs and documents and would like counsel to submit answers in writing to the court's questions by 5:00 p.m. on Tuesday, July 21, 2026. The questions should not be construed as suggesting that the court has made any conclusive determinations prior

to argument.  Parties shall file public and, if necessary, confidential versions of their answers, of not more than 3,000 words.

The oral argument will be dedicated to rebuttal arguments to the answers filed by opposing counsel.  The court will also permit but not require brief opening statements.  The length of parties' presentations shall not exceed twenty-five (25) minutes for Plaintiff and twenty-five (25) minutes for Defendant and Defendant-Intervenor (with such time to be divided by them with notification to the case manager as indicated below).

At this time, the court requires neither written answers to these questions nor presentations at oral argument from Defendant-Intervenor Aluminum Extrusions Fair Trade Committee. However, Defendant-Intervenor may either participate in the preparation and filing of Defendant's answers to the questions issued by the court or file individual answers, of not more than 3,000 words, to the questions to Defendant ("The Government").  If Defendant-Intervenor intends to divide time with Defendant at oral argument (with the combined length of the presentations not to exceed the twenty-five (25) minutes allotted to Defendant), it may notify the court of that intention by 5:00 p.m. on Friday, July 24, 2026.

## I.  Questions for IPG Photonics Corporation ("IPG")

1. The Aluminum Extrusion Orders state that "the design and production of [the products at issue] are organized around meeting certain specified thermal performance requirements." Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order, 76 Fed. Reg. 30650, 30651 (Dep't Com. May 26, 2011) ("Antidumping Duty Order"); Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 30653, 30654 (Dep't Com. May 26, 2011) ("Countervailing Duty Order") (collectively the "Aluminum Extrusion Orders") (emphasis added).  How does your interpretation that the "[t]hermal performance requirements of a finished heat sink must be specific to the electronic products for which they are designed" satisfy this language?  Pl.'s Reply in Supp. of its Mot. for J. on Agency R. at 7, June 15, 2026, ECF No. 45 ("Pl.'s Reply").

2. The Government argues that your descriptions of "physical dimensions and characteristics such as symmetry, twist, and flatness . . . did not demonstrate how the products were engineered to achieve specified thermal resistance or effective heat dissipation."  See Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. at 23, May 18, 2026, ECF No. 38 ("Gov't Br.") (citing Mem. from L. LaCivita to C. Marsh, re: Final Scope Ruling on ECCO's Heat Sinks for LED Light Bars at 19–21 (USITC Nov. 24, 2014), P.R. 1, Attachment 7 ("ECCO Scope Ruling")); see also Antidumping Duty Order, 76 Fed. Reg. at 30650; Countervailing Duty Order, 76 Fed. Reg. at 30653.  Do your submissions illustrate your heat sinks' physical dimensions and characteristics?  Are physical descriptions evidence of design and production for specified thermal performance?

3. The Government argues that "Commerce reasonably distinguished between testing conducted against predetermined, product-specific thermal performance requirements and testing conducted merely to observe or compare performance outcomes." Gov't Br. at 26–27. Is this distinction not supported by substantial evidence or not in accordance with law and why?

4. You argue that "just as in [Wagner], the record evidence shows that [IPG's] heat sinks . . . have thermal performance requirements tied to those 'downstream product[s]'." Pl.'s Mot. for J. on the Agency R. at 10, Mar. 3, 2026, ECF No. 33 ("Pl.'s Br."); see also Wagner Spray Tech Corp. v. United States, 49 CIT __, __, 779 F. Supp. 3d 1311, 1325 (2025). Why does IPG's testing of predecessor heat sinks constitute "downstream testing" as described in Wagner? See Pl.'s Br. at 7–8; Letter from K. Smith to G. Raimondo, re: Scope Ruling Application for IPG Photonics Corporation at Attachments 9–11 (Oct. 4, 2024), P.R. 1 ("Scope Ruling Application").

5. You reference the section of the International Trade Commission's determination stating how heat sinks are produced to "specific and precise tolerances." Certain Aluminum Extrusions from China, Inv. Nos. 701-TA-475, 731-TA-1177 (Final) at 7, USITC Pub. 4229 (May 1, 2011) ("Commission Final Report"); see also Pl.'s Br. at 1. Conversely, the Government cites the portions of the report stating that finished heat sinks are designed and tested at the "front end of . . . production" with "specialized design and testing equipment." Gov't Br. at 19 (internal quotation marks omitted); see also Commission Final Report at 7–8. How should these references be reconciled?

6. Why is your characterization that "[t]wice, Commerce has attempted to narrow the exclusion, and twice, this [c]ourt has rejected those attempts," relevant to the court's analysis here? See Pl.'s Br. at 1–2 (citing Wagner, 779 F. Supp. 3d at 1325; Agilent Techs. v. United States, 41 CIT __, __, 256 F. Supp. 3d 1338, 1344 (2017) ("Agilent I"); Agilent Techs. v. United States, 42 CIT __, __, 335 F. Supp. 3d 1347, 1354 (2018) ("Agilent II")).

7. Which attachments in the Scope Ruling Application describe IPG's current heat sinks, as opposed to predecessor versions, if any? See generally Scope Ruling Application. Why are differences between the predecessor and current heat sinks, if any, relevant or not?

    a. What temperature or temperature range are IPG's current heat sinks required to perform at? What temperature or temperature range was specified to IPG's original and current suppliers? See Commission Final Report at 17–18.

    b. What are the dimensions, including flat surface tolerance, of IPG's predecessor heat sinks and what are the dimensions of IPG's current heat sinks? See Commission Final Report at 7.

8.  Please specify which attachments in the Scope Ruling Application you argue Commerce did not consider.  See generally Scope Ruling Application.  Why does this support your argument that Commerce's determination is unsupported by substantial evidence or not in accordance with law?  How does Agilent II apply?  See Agilent II, 335 F. Supp. 3d at 1354.

9.  What cases and authorities best support your argument?

10. Are there any recent or pending Federal Circuit or the United States Court of International Trade ("USCIT") cases that may affect the court's analysis?

## II.  Questions for The Government

1.  Does the plain language of the Aluminum Extrusion Orders justify Commerce's reading of "specified thermal performance requirements" as standards that are "clearly defined, established prior to testing, verified through testing, and integrated throughout the design and production stages of the alleged finished heat sink"?  Gov't Br. at 19 (citing Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on IPG Photonics Corporation's Heat Sinks at 27–28 (Dep't Com. Aug. 27, 2025), P.R. 23, C.R. 5).  How should "specified" and "specified thermal performance requirements" be read in the context of the surrounding language?

2.  In the context of the Extrusion Orders' language that finished heat sinks are "fully, albeit not necessarily individually, tested to comply with [specified thermal performance] requirements," Antidumping Duty Order, 76 Fed. Reg. at 30651; Countervailing Duty Order, 76 Fed. Reg. at 30654, what is Commerce's interpretation of "full[], but not individual[]" testing?  See Antidumping Duty Order, 76 Fed. Reg. at 30650; Countervailing Duty Order, 76 Fed. Reg. at 30653.  Why is this interpretation supported by substantial evidence and in accordance with law?  How does IPG's testing fail to satisfy this interpretation?

3.  Has Commerce provided a sufficient analysis of the C.F.R. § 351.225(k)(2) factors to sustain its determination should the court find that neither the plain language nor the k(1) factors are determinative?

4.  You cite the portions of the Commission Final Report stating that finished heat sinks are designed and tested at the "front end of production" with "specialized design and testing equipment."  Gov't Br. at 19; see also Commission Final Report at 7–8.  In contrast, IPG references the section of the Commission Final Report stating how heat sinks are produced to "specific and precise tolerances."  Pl.'s Br. at 1; see also Commission Final Report at 7.

How should the court reconcile the Parties' different references to the Commission Final Report and your arguments regarding the 19 C.F.R. § 351.225(k)(1) materials?

5. Why are Commerce's determinations in ECCO and Agilent relevant to the court's analysis here? See ECCO Scope Ruling at 19–21; Mem. from T. Weinhold to C. Marsh, re: Final Scope Ruling on Agilent Technologies, Inc.'s Mass Filter Radiator at 22 (Dep't Com. Aug. 10, 2016), P.R. 1, Attachment 15 ("Agilent Scope Ruling").

   a. Does it matter that Commerce's scope determinations regarding Agilent's heat sinks were remanded twice? See Agilent I, 256 F. Supp. 3d at 1344; Agilent II, 335 F. Supp. 3d at 1354.

   b. Does it matter that the court refused to narrow the heat sink exclusion in Wagner? See 779 F. Supp. 3d at 1325.

6. IPG claims that "[d]espite the plain language of the finished-heat-sink exclusion, Commerce has resisted giving that language its full effect in scope rulings"? Pl.'s Br. at 6. Has Commerce given the plain language of the exclusion full effect?

7. You state that Commerce is only obligated to "respond to relevant, but not irrelevant points." Gov't Br. at 24–25 (quoting Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, 49 CIT __, __, 803 F. Supp. 3d 1276, 1290 (2025) (citing 19 U.S.C. § 1677f(i)(3)(A))). What points here are, in your view, irrelevant such that Commerce is not obligated to respond to them?

8. What are the thermal and dimensional discrepancies between IPG's predecessor heat sinks versus IPG's current heat sinks? Why are these discrepancies relevant to justify your claim that "generalized performance constraints and downstream testing do not establish that IPG's heat sinks were designed or produced around specified thermal performance requirements"? Gov't Br. at 18–19.

9. What cases and authorities best support your argument?

10. Are there any recent or pending Federal Circuit or USCIT cases that may affect the court's analysis?

Sincerely,

*/s/ Gary S. Katzmann*
Gary S. Katzmann
Judge