**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: GARY S. KATZMANN, JUDGE**

|  |  |
|---|---|
| IPG PHOTONICS CORPORATION, | |
| *Plaintiff*, | |
| v. | Court No. 25-00212 |
| UNITED STATES, | **NON-CONFIDENTIAL VERSION** |
| *Defendant*, | |
| and | |
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S RESPONSES TO THE COURT'S QUESTIONS**

Plaintiff IPG Photonics Corporation respectfully submits the following responses to the Court's questions, ECF No. 50:

1. The Aluminum Extrusion Orders state that "the design and production of [the products at issue] are organized around meeting certain specified thermal performance requirements." Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order, 76 Fed. Reg. 30650, 30651 (Dep't Com. May 26, 2011) ("Antidumping Duty Order"); Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 30653, 30654 (Dep't Com. May 26, 2011) ("Countervailing Duty Order") (collectively the "Aluminum Extrusion Orders") (emphasis added). How does your interpretation that the "[t]hermal performance requirements of a finished heat sink must be specific to the electronic products for which they are designed" satisfy this language? Pl.'s Reply in Supp. of its Mot. for J. on Agency R. at 7, June 15, 2026, ECF No. 45 ("Pl.'s Reply").

**Response:** Evidence that a heat sink has been designed and produced for a specific electronic product satisfies—or at least strongly suggests compliance with—the requirement from the *Aluminum Extrusion Orders* that "the design and production of [the products at issue be] organized around meeting certain specified thermal performance requirements." This follows from an

examination of the sources listed in 19 C.F.R. § 351.225(k)(1).  The *Aluminum Extrusion Orders* themselves note in the "Revision of Scope" section that finished heat sinks are "tested and assured to comply with the required thermal performance end-use specifications."  *Antidumping Duty Order*, 76 Fed. Reg. at 30650; *Countervailing Duty Order*, 76 Fed. Reg. at 30653; *see* 19 C.F.R. § 351.225(k)(1).  Additionally, as the U.S. International Trade Commission explained, finished heat sinks are "precisely or optimally suited to cool the specific electronic devices for which they have been designed," and have thermal resistance properties "relevant to the customers for whom" they "have been designed."  *Certain Aluminum Extrusions from China*, Inv. Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 (May 2011), P.R. 1, Attachment 4 at 7 ("Commission Final Report") (quotation omitted); *see* 19 C.F.R. § 351.225(k)(1)(i)(D).

Indeed, the U.S. Department of Commerce's decision to excise the phrase "sold to electronics manufacturers" from the finished-heat-sink exclusion did not change its meaning.  *See Aluminum Extrusions Fair Trade Cmte. v. United States*, 968 F. Supp. 2d 1244, 1252–53 (Ct. Int'l Trade 2014).  This is because finished heat sinks are identified by "their precise design and finish characteristics" and "their thermal resistance properties that are intended to meet the specific needs of a given piece of electronic equipment," making the phrase "sold to electronic manufacturers" "redundantly descriptive."  *Id.* at 1252.

In light of these sources, the requirement that design and production of a finished heat sink be "*organized around* meeting certain specified thermal performance requirements" can thus be satisfied by providing evidence that the heat sink was destined for use in a particular electronic product—that, through "systematic planning and united effort," rather than happenstance, the design and production of the heat sink permit it to perform to the requirements of a particular electronic product. *Organize*, Merriam-Webster Online Dictionary, https://www.merriam-

webster.com/dictionary/organize.  As discussed further below and in its briefing, IPG's evidence meets that standard.

2. The Government argues that your descriptions of "physical dimensions and characteristics such as symmetry, twist, and flatness . . . did not demonstrate how the products were engineered to achieve specified thermal resistance or effective heat dissipation." See Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. at 23, May 18, 2026, ECF No. 38 ("Gov't Br.") (citing Mem. from L. LaCivita to C. Marsh, re: Final Scope Ruling on ECCO's Heat Sinks for LED Light Bars at 19–21 (USITC Nov. 24, 2014), P.R. 1, Attachment 7 ("ECCO Scope Ruling")); see also Antidumping Duty Order, 76 Fed. Reg. at 30650; Countervailing Duty Order, 76 Fed. Reg. at 30653.  Do your submissions illustrate your heat sinks' physical dimensions and characteristics?  Are physical descriptions evidence of design and production for specified thermal performance?

**Response:**     Yes, IPG's submissions illustrate the heat sinks' physical dimensions and characteristics.  And yes, physical descriptions are evidence of design and production for specified thermal performance.

First, IPG's scope ruling application and its attachments illustrate the heat sinks' specific physical dimensions and characteristics.  The application recounts the millimeter-specific dimensions and fraction-of-an-inch flat surface tolerances of the four models of heat sinks at issue, lists the specific thermal performance requirements of the heat sinks (relating to change in temperature and a maximum temperature threshold when a laser is in use), and notes that the heat sinks have a "particular mechanical design" for mounting laser components thereon.  C.R. 1, Scope Ruling Application at 5–7, 16.  These statements are supported by the attachments, which also indicate that the heat sinks are of IPG's design and are not off-the-shelf products.  *See id.* Atts. 1, 13, 14; *see also id.*, Scope Ruling Application at 9 (explaining that the heat sinks "are used solely by IPG Photonics for manufacturing their fiber lasers," and are "not advertised, displayed [or] packaged for sale").

Second, these physical descriptions are evidence of design and production for specified thermal performance.  As this Court has explained, finished heat sinks are distinguished from

3

fabricated heat sinks and heat sink blanks largely on the basis of their physical characteristics. "Fabricated heat sinks are a broader category of aluminum extrusions that are designed around thermal properties but lack the precise surface tolerances and customized thermal resistance properties of [finished heat sinks]. Heat sink blanks are a precursor product to fabricated or finished heat sinks that require additional machining, forming, and testing." *Aluminum Extrusions Fair Trade Cmte.*, 968 F. Supp. 2d at 1251 n.1 (citations omitted). Thus, "evidence of dimensional or other physical tolerances" can demonstrate the existence of specified thermal performance requirements. *Agilent Techs. v. United States*, 335 F. Supp. 3d 1347, 1354 (Ct. Int'l Trade 2018) ("*Agilent II*"). That such requirements exist, in turn, shows that the heat sinks have been coordinated through design and production to meet those requirements. *See, e.g.*, C.R. 1, Scope Ruling Application at Atts. 9–14 (recounting the design and production process for the predecessor heat sinks that then informed the design and production of the subject heat sinks).

3. The Government argues that "Commerce reasonably distinguished between testing conducted against predetermined, product-specific thermal performance requirements and testing conducted merely to observe or compare performance outcomes." Gov't Br. at 26–27. Is this distinction not supported by substantial evidence or not in accordance with law and why?

**Response:** This distinction is not supported by substantial evidence and is not in accordance with law primarily because it is not the distinction that Commerce actually made in its scope ruling. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). Commerce stated that "the *results* of testing for compliance with specified thermal performance requirements do not necessarily prove those were the specified thermal performance requirements around which the product was designed and manufactured in the first place." P.R. 23, Final Scope Ruling at 21 (quotation omitted). In other words, Commerce's view is that it is free to discount evidence that a heat sink has been tested for compliance with specified thermal performance requirements in determining whether the heat

sink's design and production was organized around meeting those specified thermal performance requirements. But the point is that the existence of such testing reinforces that design and production have been organized around meeting those requirements.

The Government's gloss is not necessarily unreasonable—testing for purposes other than measuring compliance with thermal performance requirements may not, in some circumstances, suffice. But here, the testing evidence that IPG submitted showed that the predecessor heat sinks met downstream thermal performance requirements, that the new supplier's heat sinks matched the predecessor's performance, and that all lasers are tested with heat sinks within them to confirm compliance with IPG's thermal performance requirements. *See* C.R. 1, Atts. 9–14. Under these circumstances, even "comparison" testing should suffice, given that the predecessor heat sinks were also tested against predetermined, product-specific thermal performance requirements.

4. You argue that "just as in [Wagner], the record evidence shows that [IPG's] heat sinks . . . have thermal performance requirements tied to those 'downstream product[s]'." Pl.'s Mot. for J. on the Agency R. at 10, Mar. 3, 2026, ECF No. 33 ("Pl.'s Br."); see also Wagner Spray Tech Corp. v. United States, 49 CIT __, __, 779 F. Supp. 3d 1311, 1325 (2025). Why does IPG's testing of predecessor heat sinks constitute "downstream testing" as described in Wagner? See Pl.'s Br. at 7–8; Letter from K. Smith to G. Raimondo, re: Scope Ruling Application for IPG Photonics Corporation at Attachments 9–11 (Oct. 4, 2024), P.R. 1 ("Scope Ruling Application").

**Response:** IPG understands "downstream testing" to mean testing of a heat sink's performance within the end-product for which it has been designed and produced, rather than testing performed on the heat sink alone outside of the end-product. *See Wagner Spray Tech Corp. v. United States*, 779 F. Supp. 3d 1311, 1326 (Ct. Int'l Trade 2025) ("On remand, Commerce must reconsider the basis for its determinations that the thermal resistance properties of the heat sinks are separate from downstream products."). IPG's testing of predecessor heat sinks was conducted within lasers, and therefore constitutes "downstream testing" under that definition. *See* C.R. 1, Atts. 9–11. Additionally, because the subject heat sinks were based on the predecessor heat sinks,

"downstream testing" of the predecessor heat sinks within lasers is also probative of the subject heat sinks' design and production being organized around meeting specified thermal performance requirements.

5. You reference the section of the International Trade Commission's determination stating how heat sinks are produced to "specific and precise tolerances." Certain Aluminum Extrusions from China, Inv. Nos. 701-TA-475, 731-TA-1177 (Final) at 7, USITC Pub. 4229 (May 1, 2011) ("Commission Final Report"); see also Pl.'s Br. at 1. Conversely, the Government cites the portions of the report stating that finished heat sinks are designed and tested at the "front end of . . . production" with "specialized design and testing equipment." Gov't Br. at 19 (internal quotation marks omitted); see also Commission Final Report at 7–8. How should these references be reconciled?

**Response:**  These references are not necessarily inconsistent.  The subject heat sinks are produced to "specific and precise tolerances," and were subject to significant "front end" design and testing when taking into account the development of predecessor and prototype heat sinks that gave rise to the subject heat sinks.  That is, heat-sink design and production is an iterative process, whereby IPG designs a heat sink to perform to the specifications required by a laser, a prototype is produced to the precise dimensions required, that prototype is tested, then the prototype is fine-tuned into the finished heat sink ready for use in an electronic product—and as demonstrated by IPG's evidence, that is the process that occurred here.  *See* C.R. 1, Scope Ruling Application at 4–9, 15–17, Atts. 1, 9–14.  In any event, the Final Scope Ruling did not rely on a lack of "specialized design and testing equipment" during the "front end of … production" in reaching its decision.  *See generally* P.R. 23, Final Scope Ruling; *see Chenery*, 318 U.S. at 95.

6. Why is your characterization that "[t]wice, Commerce has attempted to narrow the exclusion, and twice, this [c]ourt has rejected those attempts," relevant to the court's analysis here? See Pl.'s Br. at 1–2 (citing Wagner, 779 F. Supp. 3d at 1325; Agilent Techs. v. United States, 41 CIT __, __, 256 F. Supp. 3d 1338, 1344 (2017) ("Agilent I"); Agilent Techs. v. United States, 42 CIT __, __, 335 F. Supp. 3d 1347, 1354 (2018) ("Agilent II")).

**Response:**  This characterization is relevant to the extent that Commerce has resisted giving the finished-heat-sink exclusion its full effect by relying on the same unpersuasive reasoning provided

6

in certain scope rulings. *Compare Wagner*, 779 F. Supp. 3d at 1321 (noting that Commerce relied on the ECCO and Agilent scope rulings), *with* P.R. 23, Final Scope Ruling 20 (relying on the ECCO and Agilent scope rulings). IPG explains how these cases support its position in response to Question 8 below.

> 7. Which attachments in the Scope Ruling Application describe IPG's current heat sinks, as opposed to predecessor versions, if any? <u>See generally</u> Scope Ruling Application. Why are differences between the predecessor and current heat sinks, if any, relevant or not?

**Response:** Attachment 1 describes IPG's current heat sinks. C.R. 1, Att. 1. The differences identified by IPG in its briefing between the predecessor and current heat sinks—namely, in dimensions and material composition—are relevant in that the related evidence provided regarding these differences demonstrate that the current heat sinks have been designed and produced to meet specified thermal performance requirements. Specifically, relevant evidence concerning the difference in material composition confirms that the IPG conducted testing to ensure that the new material would perform just as well as, or better than, the predecessor heat sink's material. C.R. 1, Atts. 9–14. And evidence concerning the different dimensions of the current heat sinks shows that they were designed and produced specifically to fit within an IPG laser and provide a particular flat surface tolerance for heat dissipation. C.R. 1, Scope Ruling Application at 4–7 (explaining, among other things, that "[t]he heat sinks were designed for maximum compactness with sufficient surface area for mounting the cooled elements and for sufficiently low thermal resistances"), Att. 1 (IPG schematics of the subject heat sinks).

> a. What temperature or temperature range are IPG's current heat sinks required to perform at? What temperature or temperature range was specified to IPG's original and current suppliers? <u>See</u> Commission Final Report at 17–18.

**Response:** IPG's current heat sinks are required to perform at the temperature range set forth in C.R. 1, Scope Ruling Application at 6, and at the temperature threshold set forth in C.R. 1, Scope

Ruling Application at 16 and Att. 11.  Specifically, the current heat sinks must prevent a laser in use from exceeding **|       |** and must not exceed a change in temperature of **|**

   **|.**

IPG designs its own finished heat sinks, as indicated by the IPG schematics provided in C.R. 1, Attachment 1, and as discussed in P.R. 1, Scope Ruling Application at 15 ("At this time, IPG determined the required thermal performance standards and then designed the measurements of each heat sink so that the standards could be met.  Low thermal resistance, mounting surfaces on both sides of the radiator and compact geometric dimensions were requirements that IPG specified with their supplier.").  IPG provided its original supplier with these required specifications and continues to ensure that the current supplier's "heat sinks would meet the same requirements."  P.R. 1, Scope Ruling Application at 16, Atts. 10, 14.  That is, IPG designed the predecessor and current heat sinks' characteristics so that they would meet its thermal performance requirements for its lasers, then provided those designs to its suppliers for the suppliers to produce the heat sinks.  IPG thus did not have to provide its heat-sink suppliers with temperature or temperature range requirements.

    b.  What are the dimensions, including flat surface tolerance, of IPG's predecessor heat sinks and what are the dimensions of IPG's current heat sinks?  <u>See</u> Commission Final Report at 7.

**Response:**  The dimensions of IPG's current heat sinks are as follows:

CM513100000100ZG:      **|**        **|**
CMUS0009602XXXXU:    **|**        **|**
CMUS0014756XXXXU:    **|**          **|**
CMUS0015888XXXXU:    **|**        **|**

The current heat sinks have a flat surface tolerance of $\leq 0.0079$ inches.  C.R. 1, Scope Ruling Application at 5.  This corresponds to a flat surface tolerance of **|                |** inches per inch at most, when taking into account the surface widths of the current heat sinks.  *See id.*; Pl.'s

Br. at 10 n.2.

Complete dimensions (including flat surface tolerance) of the predecessor heat sinks are not included in the record. Some dimensions are provided for the **|               |**, which had a width of **|          |** and a length of **|          |**. C.R. 1, Attachment 9 at ¶ 4.1. This is similar to the dimensions of the CM513100000100ZG heat sink, but the full dimensions (including height and flat surface tolerance) of the **|               |** or any other predecessor heat sink are not contained in the record.

8. Please specify which attachments in the Scope Ruling Application you argue Commerce did not consider. See generally Scope Ruling Application. Why does this support your argument that Commerce's determination is unsupported by substantial evidence or not in accordance with law? How does Agilent II apply? See Agilent II, 335 F. Supp. 3d at 1354.

**Response:** Commerce did not consider Attachments 1, 13, and 14 to the Scope Ruling Application. *See generally* Final Scope Ruling. Commerce's failure to consider that these attachments support IPG's argument that Commerce's determination was unsupported by substantial evidence and not in accordance with law because this evidence detracts from the conclusion that the subject heat sinks were not designed, produced, and tested to meet certain specified thermal performance requirements. These attachments, taken together, show that IPG designs its own heat sinks with razor-thin dimensional specificity to meet the thermal performance requirements of its lasers, and tests the heat sinks both on the front end and through post-production testing of lasers. *See* C.R. 1, Atts. 1, 13, 14.

*Agilent II* supports this conclusion. There, as here, Commerce relied on the ECCO scope ruling in deciding that "'dimensional or other physical tolerances' are not specified thermal performance requirements." 335 F. Supp. 3d at 1354. The Court rejected that argument, explaining that Commerce "was unreasonable when it discounted … evidence of dimensional or other physical tolerances that were designed to meet specified thermal performance requirements."

9

*Id.* The Court should reach the same conclusion here: it is unreasonable for Commerce to overlook evidence of dimensional specificity in deciding whether a heat sink's design and production were organized around meeting particular thermal performance requirements. Additionally, the Court in *Agilent II* further opined that "[i]t seems quite unlikely that Commerce can confine itself to a limited 19 C.F.R. § 351.225(k)(1) analysis here and reach a supported conclusion for the question of whether" the heat sinks at issue were "designed and produced around meeting specified thermal performance requirements." *Id.* at 1354–54. To the extent that a (k)(1) analysis cannot resolve this case, IPG respectfully submits that a (k)(2) analysis is likewise appropriate here, and that Commerce should conduct such an analysis on remand. *See* Pl.'s Br. at 17–18.

9. What cases and authorities best support your argument?

**Response:** The cases that best support IPG's argument are *Wagner*, 779 F. Supp. 3d 1311; *Agilent Techs. v. United States*, 256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) ("*Agilent I*"); and *Agilent II*, 335 F. Supp. 3d 1347.

10. Are there any recent or pending Federal Circuit or the United States Court of International Trade ("USCIT") cases that may affect the court's analysis?

**Response:** IPG is not aware of any recent or pending Federal Circuit or USCIT cases that may affect the court's analysis.

Respectfully submitted,

/s/ Sarah S. Sprinkle
Sarah S. Sprinkle
Luke Mathers
Christopher D. Yankson
**SANDLER, TRAVIS & ROSENBERG, P.A.**
1300 Pennsylvania Avenue, NW.
Suite 400
Washington, D.C. 20004-3002
(202) 730-4969
ssprinkle@strtrade.com

Dated: July 21, 2026

10

## CERTIFICATE OF COMPLIANCE

I certify that this submission complies with the word-limitation set forth in the Court's July 7, 2026 letter, ECF No. 50, and, excluding the Court's questions, contains less than 3,000 words.

/s/ Sarah S. Sprinkle

Dated: July 21, 2026                                Sarah Sprinkle