NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

IPG PHOTONICS CORP. v. UNITED STATES,

    Plaintiff,

  v.

UNITED STATES,

    Defendant,

  and

ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,

    Defendant-Intervenor.

Before: Hon. Gary S. Katzmann, Judge

Court No. 25-00212

NON-CONFIDENTIAL VERSION

Business Proprietary Information Removed from Pages: 2-3

### POST-ARGUMENT SUBMISSION

Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Aluminum Extrusions Fair Trade Committee*

Dated: August 4, 2026

NON-CONFIDENTIAL VERSION

## I.     <u>INTRODUCTION</u>

Finished heat sinks are a narrow category of heat sinks that are excluded from the scope of the orders. All other heat sinks are expressly covered because the domestic industry makes them. In briefing and at oral argument, Plaintiff tried to blur the lines between finished and unfinished heat sinks in a way that would render the finished heat sink exclusion meaningless and would lead to the recurrence of material injury to the domestic industry. As described in detail in the Department of Commerce's final scope ruling, the plain language of the scope as confirmed by the k(1) factors lay out clear requirements for the finished heat sink exclusion, and Plaintiff's products do not meet those requirements.

## II.     <u>DESIGN AND PRODUCTION AROUND SPECIFIED THERMAL PERFORMANCE REQUIREMENTS</u>

In relevant part, the scope requires that the "design and production" of finished heat sinks be "organized around meeting certain specified thermal performance requirements." *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650, 30,651 (Dep't Com. May 26, 2011) (antidumping duty order); *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,653, 30,654 (Dep't Com. May 26, 2011) (countervailing duty order) (collectively the "Orders"). This formulation necessitates that specified thermal performance requirements exist at the design phase. Commerce appropriately confirmed this reading of the plain language of the scope through use of the k(1) factors, citing the ITC's view that "'highly trained employees manage the FHS {finished heat sink} design and testing equipment' so that '{s}ubstantial thermal analysis and testing are associated with the *front end* of FHS production.'" Final Scope Ruling, C.R. 5, P.R. 23 at 17 (emphasis in original).

At oral argument, Plaintiff's counsel identified only Attachment 1 of IPG's original scope ruling request as purported evidence that the heat sinks at issue were designed to meet specified

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Ct. No. 25-00212**                                              NON-CONFIDENTIAL VERSION

thermal performance requirements. [

]. Scope Ruling Application, C.R. 1, P.R. 1 at Attachment 1. But Plaintiff claims to have "determined the thermal performance standards required" [

]. *Id.* at 8-9. In other words, the only evidence the Plaintiffs provided to meet the front end "design and production" elements of the finished heat sink exclusion [

].

Plaintiff cannot demonstrate front end design around specified thermal performance requirement and instead invites the Court to simply infer that the design and production requirements were met. Specifically, Plaintiffs argue that the requirements "can {} be satisfied by providing evidence that the heat sink was destined for use in a particular electronic product." Pl. Answers to Ct. Questions, ECF 55-56 at 2 (emphasis omitted). Or as Plaintiff's counsel told the Court, a wet umbrella proves it was raining. Not so here. The k(1) factors are once again instructive; as Commerce explained in its Final Scope Ruling, the ITC found that "Highly trained employees manage the FHS design and testing equipment . . . Substantial thermal analysis and testing are associated with the front end of FHS production." Final Scope Ruling at 17. There is zero evidence on the record of any of the "front end" design and production processes for finished heat sinks described by the ITC.

Notably, Plaintiffs' "destined for use" argument is refuted by the orders themselves. The orders describe "fabricated heat sinks" *i.e.*, a type of covered heat sink, as "fabricated to the end product specifications." *Id.* at 24 (emphasis added). That a heat sink is made to a product's end use specifications clearly does not demonstrate that it was designed around specified thermal performance requirements.

Commerce reasonably concluded that design and production requirements of the finished heat sink exclusion were not met.

### III. TESTING TO MEET SPECIFIED THERMAL PERFORMANCE REQUIREMENTS

In relevant part, the scope also requires that the finished heat sinks be "fully, albeit not necessarily individually, tested" to comply with the specified thermal performance requirements around which the heat sink was designed and produced. *See* the Orders. "Full" testing means that the specific heat sink design at issue must be tested against that model's specified thermal performance requirements.

Plaintiff put two sets of "tests" on the record in an attempt to allegedly satisfy this element of the scope exclusion requirements. First, Plaintiff characterized the marketing materials provided at Attachment 8 of the Scope Ruling Request as a test of the predecessor heat sink. Pl.'s Mot. for J. on the Agency R., ECF No. 33 at 7-8. Commerce examined the provided materials and found "no linkage" between the heat sink discussed there and the heat sinks at issue. Final Scope Ruling at 19. Indeed, Attachment 8 provides only "[

]," and contains no reference to specific thermal requirements of the actual Products (or even their alleged predecessors). Scope Ruling Application at Attachment 8. In fact, Plaintiff admits that the material composition of the heat sinks examined in Attachment 8 are different that the heat sinks at issue; the dimensions are different; and the tolerances are not even on the record. Pl. Answers to Ct. Questions at 7. If there was Venn diagram of the products at issue and the products described in Attachment 8, there is no record evidence that they overlap at all in any meaningful or identifiable way. *See* Final Scope Ruling at 19-20.

Second, IPG also put some internal communications regarding "comparison tests" on the record at Attachments 10 – 12, but Commerce correctly found that these tests do not tie to the

products at issue either. *Id.* at 21-23. For example, Attachment 10 does not contain dimensions or metallurgical composition of whatever was tested; it also does not contain test parameters, and the model numbers do not match any of the products in question. *Id.* at 22-23. Similarly, Attachment 11 lacks any model number or other identifying information, and the Plaintiff presented prototype test results utilizing an entirely different laser model than the model referenced in Attachments 10 and 12. *See id.* And finally, in Attachment 12, it is unclear whether the heat sink being tested is even of Chinese origin. *Id.*

As a result, Commerce reasonably concluded that the testing requirements for the finished heat exclusion were also not met.

## IV.    CONCLUSION

As Commerce explained in its Final Scope Ruling, the orders themselves differentiate between covered fabricated heat sink and excluded finished heat sink, explaining that "fabricated heat sinks" are "any heat sink blank that has been cut-to-length, precision machined, and or otherwise fabricated to the end use specifications, but not yet tested, assembled onto other materials, or packaged." *Id.* at 24. Compare this to how the Plaintiffs themselves describe their heat sinks: "the {aluminum extruded} profile is cut to length and the required number of fins are combined, pressed together, and milled on a CNC machine." Scope Ruling Application at 8. The heat sinks are imported alone; they are not assembled; they are not individually tested; and they are not packaged for sale. *Id.* 8-9. In other words, Plaintiffs appear to have requested a scope exclusion for a fabricated heat sink, which is explicitly covered by the scope.

The burden is on the Plaintiffs to demonstrate with record evidence that their products are not the heat sinks covered by the scope. Commerce reasonably found that the Plaintiffs failed to meet that burden and the Court should sustain that determination.

4

**Ct. No. 25-00212**                                      NON-CONFIDENTIAL VERSION

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Aluminum Extrusions Fair
Trade Committee*

Dated: August 4, 2026

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to ECF 62, the undersigned certifies that this submission complies with the word limitation requirement.   The word count for Aluminum Extrusions Fair Trade Committee's Answers to Questions, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2026), is 1,242 words.

*/s/ Robert E. DeFrancesco, III*
(Signature of Attorney)

Robert E. DeFrancesco, III
(Name of Attorney)

Aluminum Extrusions Fair Trade Committee
(Representative Of)

August 4, 2026
(Date)